830 F.2d 294
 126 L.R.R.M. (BNA) 2506, 265 U.S.App.D.C.
146, 56 USLW 2216,
2 Indiv.Empl.Rts.Cas. 978
 AMERICAN POSTAL WORKERS UNION, AFL-CIO, et al.,
v.
UNITED STATES POSTAL SERVICE, Appellant.
AMERICAN POSTAL WORKERS UNION, AFL-CIO, Appellant, 480-481
Area Local, et al.
v.
UNITED STATES POSTAL SERVICE.
 Nos. 85-5632, 85-5653.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 3, 1986.
Decided Oct. 2, 1987.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 84-00909).
 John D. Bates, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence, Washington, D.C., and Mitchell Rand, Asst. U.S. Attys. were on the brief for, U.S. Postal Service, appellant in No. 85-5632 and cross-appellee in No. 85-5653. Mitchell Berger and Michael Joseph Ryan, Asst. U.S. Attys., Washington, D.C., entered appearances for U.S. Postal Service.
 Penny Ann Pilzer, of the Bar of the District of Columbia Court of Appeals, pro hac vice by special leave of Court, with whom Anton G. Hajjar, Washington, D.C., was on the brief for American Postal Workers Union, AFL-CIO, appellees in No. 85-5632 and cross-appellants in No. 85-5653. Darryl J. Anderson, Washington, D.C., entered an appearance for American Postal Workers Union, AFL-CIO.
 Arthur B. Spitzer, Washington, D.C., for amicus curiae, ACLU, urging modification and affirmance of the District Court's decision.
 Before WALD, Chief Judge, RUTH BADER GINSBURG and BORK, Circuit Judges.
 WALD, Chief Judge:
 
 
 1
 The United States Postal Service appeals from an order of the District Court directing it to reinstate discharged postal worker Joseph Gordon. The District Court concluded that, in dismissing Gordon, the Postal Service was motivated by a desire to punish his exercise of constitutionally protected speech and accordingly ordered that Gordon be reinstated to his prior position. Nevertheless, the District Court held that some punishment short of discharge could constitutionally be imposed on Gordon and remanded to the Postal Service to determine by arbitration appropriate sanctions through adjustments in Gordon's back pay, seniority rights, and benefits. We affirm the District Court's determination that Gordon was dismissed in violation of the first amendment, but we reject the assumption that some lesser punishment could be imposed. We conclude that Gordon is entitled to reinstatement with full back pay.
 
 I. BACKGROUND
 A. The Facts[1]
 
 2
 Joseph V. Gordon was employed by the Postal Service in Royal Oak, Michigan, for 11 1/2 years until he was fired on July 7, 1983. J.A. at 107, 74. At the time of his dismissal, Gordon was working as a registry clerk; his duties consisted of guarding and accounting for valuables sent through the mail. J.A. at 74. Gordon received several commendations and monetary awards from the Postal Service during his employment. J.A. at 319-24.
 
 
 3
 Gordon was a member and steward of the 480-481 Area Local of the American Postal Workers Union ("APWU"). J.A. at 61, 110. He edited the local's monthly newsletter, The 480-481 Communicator, and wrote a regular column for the newsletter. J.A. at 61. The newsletter is sent to members and retired members of Local 480-481 and to the offices of other APWU locals. Its total circulation is around 2,100. J.A. at 30.
 
 
 4
 Gordon's column in the May, 1983, issue of The Communicator was entitled "Workers of the World Unite...."[2] J.A. at 61-64. The first three paragraphs of the column discussed in general terms the advantages of unionism for workers and offered suggestions for persuading nonmembers to join the union. See J.A. at 62-63. The fourth paragraph of the column stated:
 
 
 5
 I was motivated to write this article by a recent discovery that I made at work. While working third class letters a few weeks ago I came across a bundle of letters that were being sent from Congressman Phillip Crane, a Republican from Illinois, the return address simply stated: Congressman Phillip Crane, National Right to Work Committee. Well, naturally I was curious just what the Congressman was trying to communicate under such a dubious association with the right to work committee. My curiosity did not have long to wait because one of the letters was not sealed and the contents fell out as I was sorting the mail. I could not help but seeing just what was inside. I was amazed to find that the Congressman was sending out petitions asking for help in an attempt to organize a legislative effort to support a bill that would restrict Labor Unions from organizing workers through what he called strong arm tactics. Now, I can not imagine that these petitions were going to actual members of the work force but rather to members of management, but let's assume that he was in fact addressing a member of the labor force; just what is he asking? In short he was requesting that the recipient of the petition organize in an effort to prevent them for [sic] organizing or at least to prevent others from organizing to improve the status of the worker. In other words he wanted help from unorganized labor to keep them that way; I wonder why he just didn't ask them to support the reinstitution of slavery.
 
 
 6
 J.A. at 63-64. The final paragraph reiterated the importance of unionism and of convincing nonmembers to join the union and concluded: "Ask your stewards who the non-members are in your office and make a tactful intelligent effort to sign them up, but don't use 'strongarm' tactics, it might upset Phillip Crane." J.A. at 64.
 
 
 7
 Howard Byrne, director of labor relations at the Royal Oak post office, received a copy of the newsletter from the postmaster. J.A. at 64, 223. Byrne asked general supervisor Charlene Bonds to investigate how Gordon had learned of the contents of the letter mentioned in his column. Id.
 
 
 8
 Bonds questioned Gordon about the column around midnight on May 26, 1983. J.A. at 64-65. Bonds accused Gordon of violating Postal Service regulations by reading mail and disclosing its contents. J.A. at 65. During the discussion, Gordon gave Bonds the following written statement:
 
 
 9
 I, as Editor and Contributor to the 481 Area Local Communicator wrote an article concerning a letter from Congressman Crane. I was made aware of the petition by a friend who was asked to sign it. He later on then asked me about a right of Congressman to use the priveledge [sic] of the free mail to distribute such material. I didn't think it was right for Postal Workers to have to handle such mail and fabricated the story about finding the "Crane" mail myself. I did not see, personally, the petition, but I believe it listed the irony that I was trying to stress as a representative of the labor movement and especially the American Postal Workers Union, is that there are rich people in this country that want to get richer off the labor force.
 
 
 10
 I was unaware that disclosure of the contents the way it was written into the article was a violation so for the purpose of relating the article to Postal Workers, I did so. Just as the article in question has been brought to my attention by you, how is it that I cannot be certain that my Communicator was read by Postal management, which is while in the mail.
 
 
 11
 Thus, the article is not true in respect to how the petition was discovered. I do not even work 045 [third-class mail], except on a very rare occasion. If the USPS is offended by the fabrication I will print a correction in the new issue of the paper.
 
 
 12
 J.A. at 65.
 
 
 13
 After he completed his shift on May 27, Gordon wrote and delivered to the printer a retraction of his story concerning the Crane letter. J.A. at 67, 111-13. The retraction was published in the June, 1983, issue of the Communicator as the last paragraph of a column dealing with other subjects. J.A. at 64. It stated:
 
 
 14
 Last month I wrote an article entitled "Workers of the World Unite ..." that contained a fabrication for dramatization. I refer to the portion concerning the manner in which I discovered the "Right to Work" petition. I personally do not throw 045 or any mail for that matter, and was made aware of the petition by a friend who was asked to sign it. I attempted to show the irony of the labor force (APWU) handling mail such as this, it was a mistake. It is illegal to disclose the contents of mail even if the mail is meant for further distribution.
 
 
 15
 J.A. at 67.
 
 
 16
 After interviewing Gordon, Bonds immediately wrote and delivered to Byrne a report on her discussion with Gordon, to which she attached Gordon's written statement. J.A. at 66-67. In her report, Bonds stated that she had told Gordon that he had violated Secs. 115.2 and 115.5 of the Domestic Mail Manual,[3] and that "what he has done or stated he did is a very serious matter and that he could be discharged." J.A. at 66-67. She did not make any recommendation as to what form of discipline should be imposed.
 
 
 17
 Byrne drafted a notice of removal as soon as he received the report from Bonds. J.A. at 223. The only pieces of evidence before him when the decision to fire Gordon was made were the column itself and Bonds' report on her interview with Gordon, including Gordon's written statement. J.A. at 74. The discharge notice, which was dated May 27, 1983, was delivered to Gordon on June 2. J.A. at 67. The notice stated as the reasons for discharge that Gordon had violated Secs. 115.2 and 115.5 of the Domestic Mail Manual, as well as part 661.53 of the Employee and Labor Relations Manual of the Postal Service, which forbids any employee from engaging in "conduct prejudicial to the Postal Service." J.A. at 68, 73.
 
 
 18
 Gordon and the union filed a grievance, claiming that Gordon was being discharged without just cause in violation of Article 16 of the collective bargaining agreement between the union and the Postal Service. J.A. at 68-72. The final decision on the grievances stated that "[t]he grievant's action in the instant grievance violated the integrity of the mail service and part 15.5 [sic] of the DMM. Accordingly, just cause was established and this grievance is denied." J.A. at 72.
 
 
 19
 The union then sought arbitration of the grievance. J.A. at 73. The arbitrator upheld Gordon's dismissal, but did not decide the factual dispute about whether Gordon had read and disclosed the contents of mail that he saw on the job. Instead, the arbitrator concluded that it was
 
 
 20
 immaterial whether [Gordon] ... actually read the mail on the job, as he stated in the article, or whether he only made it up for dramatic impact, as he now contends, as long as he made public expressions that he did read the mail while on the job. Insofar as the Postal Service is concerned, the effect under either circumstance is the same. That effect is to seriously erode the confidence which the public should have in the Postal Service.
 
 
 21
 J.A. at 316.
 
 B. The District Court's Decisions
 
 22
 Following the arbitrator's decision, Gordon and his local and national unions brought this action in the District Court. Count I of the complaint alleged that the "discharge of Gordon was not for 'just cause,' and was in violation of the collective bargaining agreement," and that the arbitrator's decision "was contrary to law and fact, beyond his authority, and not based on the collective bargaining agreement." J.A. at 8-9. Count II alleged that Gordon's dismissal violated the rights to freedom of speech and freedom of the press of Gordon, the union, the union's members, and postal workers in general. J.A. at 9.
 
 
 23
 The Postal Service filed a motion for summary judgment on both claims. In an unpublished order dated September 7, 1984, the District Court granted the motion with respect to the contract claim, but denied the motion on the constitutional claim, holding that a number of material issues remained in dispute. J.A. at 37-38.
 
 
 24
 Each of the parties then moved for summary judgment on the issue of whether Gordon's speech was constitutionally protected under the balancing test set out in Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The parties and the court agreed to assume, for purposes of these motions, that Gordon's discharge was based on his speech, not on his underlying conduct.
 
 
 25
 The District Court denied the Postal Service's motion for summary judgment and granted the plaintiffs' cross-motion. The Court first held that Gordon's column, including the paragraph in which he disclosed the contents of the Crane letter, constituted speech on a matter of public concern: "strategies for increasing union membership ... [and] the much-discussed issue of how unions should respond to the right-to-work movement." American Postal Workers Union v. United States Postal Service, 598 F.Supp. 564, 569 (D.D.C.1984) (footnote omitted). The Court rejected the argument of the Postal Service that Gordon's speech was a "knowing lie" which deserved little or no constitutional protection: "Otherwise protected speech cannot lose its constitutional protection solely by virtue of containing a knowingly or recklessly false statement, absent a showing of the harmful nature of the speech." Id. at 570. Characterizing Gordon's statements about how he became aware of the contents of the Crane petition as "no more than a harmless fiction or an apocryphal story that illustrated his theme but was not literally true," the Court noted that "[s]uch fictions are stock-in-trade for politicians and others speaking on issues of public concern. Absent harm in a real sense, such parables can hardly even be called lies or knowing falsehoods." Id.
 
 
 26
 The District Court then turned to the second half of the Pickering balance and considered whether there had been a sufficient showing of harm to the " 'government's interest in the effective and efficient fulfillment of its responsibilities to the public' " to outweigh Gordon's interest in free speech. Id. (quoting Connick v. Myers, 461 U.S. 138, 150, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983)). The Court held that where, as here, the challenged speech related to a matter of substantial public concern, a showing of actual harm was necessary, and it concluded that the Postal Service had failed to establish that any actual harm resulted from Gordon's speech. Id. at 571-72.
 
 
 27
 The one issue remaining to be resolved was whether Gordon's speech was a substantial or motivating factor in his dismissal. The case was submitted to the District Court for determination of this issue on the stipulated facts and documentary exhibits. In its final decision, the District Court found that Howard Byrne was "substantially motivated by Gordon's protected speech" in making the decision to fire him. American Postal Workers Union v. United States Postal Service, 603 F.Supp. 393, 396 (D.D.C.1985). The Court based its finding on the fact that Byrne acted immediately to fire Gordon as soon as he received Bonds' report, without conducting any further investigation as to whether Gordon had in fact violated postal regulations by opening or disclosing the contents of mail he handled. The Court characterized Byrne's conduct as "precipitous behavior ... in a situation that called for a more measured and careful response." Id. It ordered that Gordon be reinstated, and remanded the case to the Postal Service for arbitration on the issues of back pay, seniority rights, and benefits to determine what would constitute an "appropriate penalty short of discharge...." Id. at 397. The plaintiffs, asserting that reinstatement with full back pay is the proper remedy for the violation of Gordon's constitutional rights, have cross-appealed from the portion of the District Court's order remanding the case for arbitration.
 
 
 28
 II. THE CONSTITUTIONAL STATUS OF GORDON'S SPEECH
 
 
 29
 A. First Amendment Law Concerning Speech by Public Employees
 
 
 30
 It is now well-settled that the first amendment protects the speech of public employees as well as private citizens. Rankin v. McPherson, --- U.S. ----, ----, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (U.S.1987). Public employees, however, enjoy less first amendment protection than private citizens because the government, federal or state, has a significant interest "as an employer in regulating the speech of its employees" in order to perform its public services effectively. Pickering, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In Pickering, the Supreme Court stated that "[t]he problem in any [government employee] case is to arrive at a balance between the interests of the ... [employee], as a citizen in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id.
 
 
 31
 Since Pickering, the Supreme Court has refined the balancing test somewhat. In Connick v. Myers, the Court turned the "public concern" element of the Pickering formulation into a threshold requirement: "if [a public employee's speech] ... cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for [a court] ... to scrutinize the reasons for [the employee's] ... discharge." 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983) (footnote omitted). According to Connick, only if a court finds that the public employee's speech meets this threshold requirement should the court go on to balance the employee's interests in free expression against the government's interest in curtailing the expression. Id. at 149-150, 103 S.Ct. at 1691.
 
 
 32
 Rankin represents the most recent Supreme Court statement concerning the protection of public employee speech under the first amendment. In that case the Constable of Harris County, Texas dismissed a deputy named Ardith McPherson who, upon hearing of an attempt to assassinate the President of the United States, said " 'if they go for him again, I hope they get him.' " --- U.S. at ----, 107 S.Ct. at 2895. Following Connick, the Court first considered whether McPherson's statement addressed a matter of public concern. The Court held that it did because of the "context" in which it was made: "The statement was made in the course of a conversation addressing the policies of the President's administration." Id. at --- U.S. at ----, 107 S.Ct. at 2897 (footnote omitted). The Court then went on to conduct the Pickering balance between the conflicting interests and concluded that the government "fail[ed] to demonstrate a state interest that outweighs McPherson's First Amendment rights." Id. at ----, 107 S.Ct. at 2899. The Court considered two possible justifications for punishing a public employee's speech: because "it interfered with the efficient functioning of the [government] office" or because it "had discredited the office by [being heard] ... in public." Id. There was no evidence, however, that McPherson's statement had actually caused harm to either one of these government interests. Consequently, the Supreme Court held that McPherson's speech was protected by the first amendment.[4]
 
 B. Application of Existing Law to This Case
 1. The Threshold Issue
 
 33
 The Rankin decision controls our conclusion that Gordon's speech was constitutionally protected. First of all, after Rankin, there can be no doubt that Gordon's speech addressed a matter of public concern. Gordon's column, entitled "Workers of the World Unite," was exclusively concerned with efforts to reinvigorate the trade union movement and, more specifically, to combat the threat to organized labor from "right to work" laws. The urge to unionize certainly falls within the category of expression that is "fairly considered as relating to any matter of political, social, or other concern to the community...." Connick, 461 U.S. at 146, 103 S.Ct. at 1690.[5]
 
 
 34
 The Postal Service, of course, did not explain Gordon's discharge on the basis of his union advocacy. Rather, the government defends his dismissal on the ground that Gordon's article contains an allusion that the government claims readers would take literally to mean that he had read and was disclosing the contents of a third-class mailing that he sorted while on postal duty. See Brief for Appellant at 17-18. Even if appellant's interpretation of Gordon's writing is valid, however, this single allusion in the midst of an acknowledgedly political editorial cannot change the legal conclusion compelled by Supreme Court precedent that Gordon's article addressed a matter of public concern for the purposes of Connick's threshold test.
 
 
 35
 In Rankin, too, the government wished to discharge a public employee for a portion of her speech. Constable Rankin did not claim to punish McPherson because she expressed criticism of the President's policies on welfare, medicaid, food stamps, and CETA funds. Instead, he fired her because of one sentence in the midst of her discourse that expressed a hope that if a second assassination attempt were made, it would succeed. The government argued that this statement, standing alone, did not constitute speech on a matter of public concern, since urging an assassination could not be a matter of public concern. But the Supreme Court refused to wrench that statement, however inflammatory and odious, out of its broader context, stating:
 
 
 36
 [T]he statement in context ... discloses that it plainly dealt with a matter of public concern. The statement was made in the course of a conversation addressing the policies of the President's administration. It came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President.
 
 
 37
 Rankin, --- U.S. at ----, 107 S.Ct. at 2897 (footnotes omitted).
 
 
 38
 The dissent in today's case echoes the dissenting opinion in Rankin, which argued strenuously that the mere association of McPherson's inflammatory statement with a discussion of the President's public policies could not transform it into protected speech. --- U.S. at ----, 107 S.Ct. at 2904 (Scalia, J., dissenting). The majority of the Supreme Court, however, rejected this proposition. The Court left no doubt on this point: A statement's context is relevant to the determination of whether it satisfies the Connick threshold test. --- U.S. at ----, 107 S.Ct. at 2896-97. The Court situated McPherson's remark "in the course of a conversation" addressing public issues, and emphasized that "[i]t came on the heels of a news bulletin...." Id. To make the point still more explicit, the Court refused even to consider McPherson's later repetition of her controversial comment outside of its original context. Id. at ---- - ----, n. 10, 107 S.Ct. at 2897-98, n. 10.[6]
 
 
 39
 The editorial context in which Gordon referred to the contents of the Crane mailing compels the conclusion that the entire presentation "touch[ed] upon a matter of public concern." Connick, 461 U.S. at 147, 149, 103 S.Ct. at 1690, 1691. Gordon's discussion of the contents of the Crane letter--the basis for the inference that he violated Postal Service nondisclosure regulations--cannot be textually isolated from his substantive discussion of the "right to work" issue raised by that letter. Stated otherwise, the speech for which Gordon was discharged was inextricably bound up with speech on a matter of admitted public concern.[7]
 
 
 40
 Following Rankin, therefore, we avoid asking at the threshold level whether Gordon's assertion that he disclosed a third class mailing's contents, excerpted from its original context, "may not warrant the same level of First Amendment protection." Rankin, --- U.S. at ---- n. 10, 107 S.Ct. at 2898 n. 10 That decision turns on the Pickering balancing test, which expressly takes government harm into account.[8] The threshold inquiry into public concern merely determines whether a government discharge decision is "subject to judicial review" at all under the first amendment and obviously is distinct from the ultimate question of whether Gordon's remark is constitutionally protected speech. See Connick, 461 U.S. at 146, 103 S.Ct. at 1690.
 
 2. The Pickering Balance
 
 41
 Rankin also is dispositive as to the balancing test promulgated in Pickering to properly weigh individuals' first amendment interests against governments' interests in restricting the expression of its employees. The government asserts that its interest in this case is the "public's confidence in the confidentiality of the mailstream." Brief for Appellant at 16.[9] Obviously the concern is legitimate, but the government has offered no evidence that Gordon's speech harmed this interest. See American Postal Workers Union v. United States Postal Service, 598 F.Supp. 564, 571 (D.D.C.1984).[10] Indeed, the government concedes that it cannot show any concrete harm in this case. See Brief for Appellant at 15, 22-23.[11] Given the absence of any demonstrated harm caused by Gordon's speech, Gordon must prevail in the balancing of competing interests.[12] Rankin explicitly states that the government "bears a burden of justifying the discharge on legitimate grounds," --- U.S. at ----, 107 S.Ct. at 2898. The present case mirrors Rankin in that the government has totally failed to meet this burden: It has offered no evidence whatsoever, apart from a postal official's opinion, that Gordon's speech interfered with a legitimate government interest.[13]
 
 
 42
 Even if it were possible in some situations, after Rankin, for the government to pass a Pickering balancing test without offering any evidence of actual harm to its asserted interest, this is not such a case, given the limited nature of Gordon's audience and the substance of what he actually wrote. Gordon's article was circulated only to currently employed and retired postal workers. There is no evidence that any member of the more general public read his article. Though several of the 2,100 copies may possibly have come to the attention of nonemployees,[14] this accidental public readership could only be small, and certainly is not to be presumed in the absence of any proof.[15]
 
 
 43
 Even assuming that some member of the general public did read the article, we are skeptical that the article would have diminished her confidence in the integrity of the United States Postal Service. Gordon's article does not describe him opening any mail. It does not describe him deliberately reading any mail. Instead, Gordon's article describes him inadvertently viewing one letter, from a mass third-class mailing, that happened to fall out of its envelope.[16] The letter was itself a political petition intended for mass distribution. Readers of Gordon's column might well distinguish between a mass third-class mailing appeal and personal letters, the privacy of which is obviously of paramount importance to any user of the mails.[17] Thus, had Gordon written about a magazine or newsletter headline that he "could not help but seeing" while sorting the mail, the argument that his readers would doubt the confidentiality of their personal correspondence would be silly. Similarly, we strongly question whether the ordinary reader of Gordon's statement about the Crane "right to work" petitions would have misgivings about the security of her private missives.
 
 
 44
 Considering (1) the small probability that anyone not associated with the Postal Service actually read Gordon's statement about the Crane letter with (2) the extreme unlikelihood that such a person would as a result of her reading lose confidence in the integrity of the mailstream, and (3) the silence of the record as to any objective harm experienced by the Postal Service from the supposed weakened confidence of Gordon's readers, we cannot escape the conclusion that the Pickering balance tips heavily towards first amendment protection. The slim chance that the public's confidence in the confidentiality of the mails was diminished by Gordon's words clearly cannot validate abridging his first amendment interest in writing about "right to work" legislation and its perceived threat to the labor movement.
 
 
 45
 This conclusion, based on the Pickering balancing test, should suffice. However, because the government and the dissent argue that Gordon's remarks, if "knowingly false," might not outweigh even a de minimis risk to the public's confidence in the integrity of the mailstream, we think several clarifications will be helpful. First, though Pickering left undecided whether a knowingly or recklessly false statement by a public employee will still be protected by the first amendment in the absence of a clear showing of harm resulting from the speech, 391 U.S. at 574 n. 6, 88 S.Ct. at 1738 n. 6, no court has ever summarily denied a public employee's first amendment claim on that ground. See Brasslett v. Cota, 761 F.2d 827, 840-41, 845-46 (1 Cir.1985) (finding that employee's statements were knowingly or recklessly false is merely one factor to be weighed in Pickering balance; such statements may be protected absent "independent showing of actual and significant harm"). To be sure, intentional falsehoods are among the forms of expression least deserving of first amendment protection,[18] and a public employee's interest in uttering deliberate, harmful lies obviously cannot outweigh the Postal Service's interest in promoting the more deserving first amendment activities of the general public in using the mails to communicate their thoughts. But we are not dealing here with knowingly false and harmful statements of fact and the government grossly mischaracterizes Gordon's speech by denouncing it as such.
 
 
 46
 Gordon did not intend to convey to his readers "false statements of fact." Rather, he wrote a fictional account of how he encountered the Crane "right to work" petition in an attempt "to show the irony of the labor force ... handling mail such as this...." J.A. at 67. It is absolutely crucial that, for the purposes of evaluating first amendment claims, courts distinguish analytically between intentionally false statements of facts on the one hand and narrative fiction on the other. The analytic distinction, of course, is that a statement of fact purports to be true, even when it is false, while narrative fiction does not purport to describe events that have actually happened. Narrative fiction, unlike an intentionally false statement of facts, deserves considerable first amendment protection. Indeed, some forms of political expression, like satire, often cannot be fully realized except in the form of narrative fiction. Famous examples include, Swift's Gulliver's Travels, Robert Penn Warren's All the King's Men, and Edwin O'Connor's The Last Hurrah, not to mention Garry Trudeau's daily Doonesbury comic strip.
 
 
 47
 Even if we assume that Gordon "failed" in his attempt to convey his vignette as fiction, his effort to express the "irony" he saw in postal employees having to work on mail that denigrated their rights to unionize does not lose all value in the Pickering analysis. Gordon's interest in expressing his political sentiments about "right to work" advocacy, though unsuccessful as a literary effort, is a recognizably greater first amendment interest than the interest someone else might have in uttering a deliberately false statement of fact. Indeed, just as an intentionally false statement of fact lies close to, if not at, the lowest end of a spectrum of first amendment values, the interest that an individual, like Gordon, has in trying to express his political sentiments lies close to, if not at, the top of that spectrum.[19] Thus, given the proper characterization of Gordon's first amendment interest in this case, coupled with the negligible chance that the limited circulation of his article affected the public confidence in the confidentiality of the mailstream, the Pickering balancing of interests necessarily leads to the conclusion that Gordon's speech was protected.[20]
 
 
 48
 In reaching this conclusion, we in no way suggest that, as a general matter, government postal workers may state, with impunity, that they read or disclose the contents of mail. The Pickering analysis would be very different if (to take an example that seems no less improbable than the stipulated facts of this case) a postal worker who was a contestant in a nationally televised game show, responding to a question from the game show host on whether she ever had the urge to read people's mail, answered, "Sure. Not only do we have the urge, we do it all the time." But that case is not this one, and the two cannot be lumped together. Connick and Rankin recognize that Pickering requires a "particularized balancing" into the nature and weight of the competing interests, however "difficult" that judicial task may be. Connick, 461 U.S. at 150, 103 S.Ct. at 1692; see also Rankin, --- U.S. at ----, 107 S.Ct. at 2898. ("In performing the balancing, the statement will not be considered in a vacuum...."). In this particular case, Gordon made an "unfortunate," see Rankin, --- U.S. at ----, 107 S.Ct. at 2901 (Powell, J., concurring), attempt to fictionalize his political reaction to a "right to work" flier shown to him by a fellow worker.[21] Yet, despite his maladroit attempt at fiction, the expression of his political beliefs remains protected speech, especially when the government has conceded that it lacked any evidence of actual harm, the article was sent to no member of the general public, and there is no evidence to suggest that any reasonable reader who might have happened on the piece would have lost confidence in the integrity of the mails. Thus, the special facts of this case reveal, just as in Rankin, that the public employee's speech, although "ill-considered," remains nonetheless "protected by the First Amendment." --- U.S. at ----, 107 S.Ct. at 2901 (Powell, J., concurring).[22]
 
 
 49
 C. Relationship of the Pickering Line of Cases to Defamation Law
 
 
 50
 A straightforward application of the two-part test developed in Pickering and Connick, and refined in Rankin, resolves the dispute over the constitutional status of the public employee's speech in this case. However, because the dissent discusses the law of defamation at length and accuses us of "doing severe damage in this circuit" to that body of law, Dissent at 315, stating also that we "deform the settled law of the first amendment," Dissent at 330, we are compelled to respond. What follows is a discussion designed to clarify the relationship between the Pickering line of cases and defamation law and to demonstrate that our reliance on the former is in full conformity with traditional first amendment rules governing defamation actions.
 
 
 51
 Defamation and public employee cases both involve a balancing of competing interests between one person's freedom of expression and the injurious consequences of that expression. See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (plurality opinion); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In this respect, they are both subsets of the same general approach to first amendment problems. But the elements that define these two subsets are nonetheless distinct. Defamation cases involve civil liability for damage to a person's reputation. Pickering cases involve discipline, usually discharge, of public employees in response to speech that allegedly causes harm to the government.[23]
 
 
 52
 The first amendment rule governing defamation claims applies regardless of who makes the defamatory statement. If a private citizen may be held liable in tort for a particular defamatory statement, then a public employee is equally liable in tort for the same statement. See Connick, 461 U.S. at 147, 103 S.Ct. at 1690. We know then that if a public employee libels a supervisor or a fellow worker, the first amendment will provide no shield from liability in a libel suit brought by the supervisor or coworker.
 
 
 53
 Similarly, the first amendment will not prevent the government worker from being discharged for the same defamatory statement. Under the Pickering analysis, the first amendment does not protect speech by public employees that "impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, --- U.S. at ----, 107 S.Ct. at 2899. Libels about officemates--precisely because libel actions require proof of damages--involve harm to the working relationships necessary for the proper functioning of a government office. Consequently, these defamatory statements would not survive the Pickering analysis. Even if the libels about coworkers involved matters of public concern and therefore passed the threshold inquiry,[24] they would not survive the second part of the analysis: the government's interest in maintaining the effective functioning of its operations.[25]
 
 
 54
 In short, our opinion is consistent with both Pickering caselaw and defamation caselaw in protecting the government against libels of its employees.[26] This opinion leaves unaffected the government's prerogative to discharge a public employee who libels a supervisor or fellow worker. And, like Rankin, this opinion cannot be read to hold that defamatory statements are "immunized" from punishment, see Dissent at 15, when placed in the context of speech on a matter of public concern. As stated above, that logic confuses Connick's threshold inquiry with the subsequent Pickering balancing. Instead, we directly follow Rankin in holding that a statement by a public employee passes the threshold test established in Connick if its context discloses that it touches on a matter of public concern. This preliminary conclusion does not determine first amendment protection. The threshold inquiry merely determines whether a Pickering balancing will occur. In this balancing, speech on a matter of public concern will lose constitutional protection if the Pickering analysis demonstrates sufficient harm to the government.[27] In the present case, no such harm was adduced. Nor did Gordon's speech harm the reputation of any other person. Defamation law too, therefore, would be unavailing.
 
 
 55
 The analogous methodologies that determine either a libel or speech that loses first amendment protection under the Pickering test, however, must not obscure the core distinction between these two lines of first amendment jurisprudence. Under a proper understanding of first amendment law, Gordon's speech can never be equivalent to a common libel of another person. The first amendment supplies no grounds for which the government could punish someone other than a public employee for Gordon's comments. If a newspaper quoted an unnamed postal worker as saying that he "could not help but see" and be repulsed by the Crane letter concerning "right to work" legislation, the government would have no basis for holding the newspaper liable even if its publication did cause a decline in the public's confidence in the integrity of the mailstreams. Under the first amendment, as interpreted by the Supreme Court in New York Times v. Sullivan, the government may not punish a private citizen for damage caused to its own reputation. See 376 U.S. 254, 273-76, 291-92, 84 S.Ct. 710, 722-23, 732-33, 11 L.Ed.2d 686. Professor Kalven, in his comment on the New York Times case, put the point well: "defamation of the government is an impossible notion for a democracy." Kalven, The New York Times Case: A Note on "The Central Meaning of the First Amendment," 1964 Sup.Ct.Rev. 191, 205. Rather, because the interest that the government seeks to protect by discharging Gordon is not the reputation of private individuals but its own public image, Gordon's speech falls into a category for which an individual cannot normally be punished by the government at all, except when the writer is a public employee. It is precisely for this reason that the distinctive threshold and balancing analysis developed in the Pickering line of cases controls the first amendment inquiry in public employee cases, and why the distinctive set of constitutional rules developed for private defamation actions do not govern this case.
 
 
 56
 Finally, a few words about the dissent's references to Ollman v. Evans, 750 F.2d 970 (D.C.Cir.1984) (en banc), are in order. Ollman concerned the fact-opinion distinction in a private defamation case. The case before us involves neither private interests protected by defamation law, nor any fact-opinion dispute. The dissent's use of Ollman is unclear, but seems to suggest that the effort to distinguish fact from opinion in Ollman resembles the task of distinguishing fiction from falsehood in this case. If so, our approach to this case appears to us to be in full accord with Ollman's admonition that the core value of the first amendment--wide open debate on issues of public importance--"requires a consideration of the totality of the circumstances that provide the context in which the statement occurs and which determine both its meaning and the extent to which making it actionable would burden freedom of speech or press." Id. at 997 (Bork, J., concurring). Consistent with that view, we examine here the totality of the circumstances surrounding Gordon's article advocating union membership in order to determine whether allowing the government to fire him for what he said would impermissibly burden his efforts to communicate his political sentiments.
 
 
 57
 We agree with the dissent that even if a statement was intended as narrative fiction, a court, in weighing the effect of the speech on the government's asserted interest, should consider the ordinary reader's understanding of the speech. That understanding is far from clear in this case, however. See Ginsburg, J., concurring. And adopting the perspective of the ordinary reader in order to determine the government's harm need not mean that the speaker's intent is irrelevant for purposes of liability. Cf. New York Times Co. v. Sullivan, 376 U.S. 254, 271-72, 288, 84 S.Ct. 710, 721, 730, 11 L.Ed.2d 686 (1963) (speaker's intent relevant in libel law); Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964) (same); St. Amant v. Thompson, 390 U.S. 727, 731, 732, 88 S.Ct. 1323, 1325, 1326, 20 L.Ed.2d 262 (1968) (same).
 
 
 58
 To conclude, we have a case with the following relevant facts. Gordon was given the Crane letter by a friend and strongly disagreed with its political message. Indeed, he thought it ironic that good union members like himself would have to handle such anti-union mailings. In an effort to convey this sense of irony, he wrote in an article expressing his own political views about unions that while sorting mail he "could not help but see just what was inside" the Crane letter and that he was amazed at the anti-union statements expressed in the letter. Gordon's article was sent out only to currently employed and retired postal workers. So far as the record shows, no member of the general public read Gordon's statements about the Crane letter, and there is no evidence that the public's confidence in the confidentiality of the mailstream was diminished.
 
 
 59
 On these facts, we decide, first, that Gordon's discussion of the Crane letter clearly addressed a matter of public concern: the issue of "right to work" legislation. Second, because the government has shown no harm to its asserted interest and because any harm that might have resulted seems de minimis given what Gordon actually said and its limited circulation, we rule that the government has failed to meet its burden to demonstrate in this case that its asserted interest outweighs Gordon's interest in engaging in political debate and in expressing, however inartfully, his outrage that union members had to handle anti-union mailings. No interest in personal reputation is involved in this case, and our opinion in no way alters settled first amendment principles involving defamation law.
 
 
 60
 III. THE DETERMINATION THAT GORDON'S SPEECH WAS A
 
 
 61
 SUBSTANTIAL OR MOTIVATING FACTOR IN THE DECISION
 
 TO DISCHARGE HIM
 
 62
 A public employee who alleges a violation of his constitutional rights must show first, that his conduct was constitutionally protected, and second, "that this conduct was a 'substantial factor'--or, to put it in other words, that it was a 'motivating factor' in the [government's decision to fire him]." Mt. Healthy City School District Board of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).[28]
 
 
 63
 The District Court concluded on the record that there was no genuine issue of material fact as to whether Howard Byrne, the Postal Service official who made the decision to fire Gordon, "was substantially motivated by Gordon's protected speech." American Postal Workers Union v. United States Postal Service, 603 F.Supp. 393, 396 (D.D.C.1985). The District Court defined the relevant issue as "the state of mind of Gordon's supervisors at the time they fired him," 603 F.Supp. at 395, and, in the absence of any direct evidence, properly looked to circumstantial evidence in resolving this issue. See Clark v. Library of Congress, 750 F.2d 89, 101 (D.C.Cir.1984) ("It is clear ... that a plaintiff need not present direct evidence ... to meet his burden of showing that protected conduct was a substantial or motivating factor in the hiring decision.").
 
 
 64
 The circumstantial evidence presented by the union strongly suggests that the Postal Service's asserted reason for firing Gordon was merely a pretext. Gordon was a longtime Postal Service employee with an exemplary record, and there is no evidence that he had ever been accused of violating Postal Service regulations before this incident occurred. The parties stipulated that "[t]he Postal Service relied solely upon the information contained in Joe Gordon's column ... and upon Charlene Bond's [sic] interview with Gordon beginning about midnight on May 26, 1983, when it made its decision to discharge him for the reasons stated in his notice of removal." J.A. at 74. In his interview with Bonds, Gordon denied the charges against him and offered a plausible explanation of his statements in the article. Byrne was therefore faced with conflicting evidence on the question of whether Gordon had violated Postal Service regulations by disclosing the contents of mail he had seen at work. Nevertheless, Byrne drafted the discharge notice as soon as he received the report from Bonds, without conducting any investigation to determine, for example, whether Gordon had been assigned to sort third-class mail during the time the Crane letter would have arrived in the Royal Oak post office, or whether the "friend" whom Gordon claimed had told him about the letter actually existed. The District Court characterized Byrne's conduct as "precipitous" and concluded that it was inconsistent with the motivation asserted by the Postal Service. 603 F.Supp. at 396. Had Byrne's true motive been to discharge Gordon for violating Postal Service regulations, he would not have fired Gordon on the spot without investigating further to determine whether such a violation in fact occurred. We affirm the District Court's conclusion that Byrne's action "necessarily was substantially motivated by Gordon's protected speech." Id.
 
 
 65
 IV. THE REMEDY FOR THE CONSTITUTIONAL VIOLATION
 
 
 66
 After the District Court determined that Gordon's firing was unconstitutional, it considered the appropriate remedy to be applied. The Court ordered that Gordon be reinstated but decided not to order full back pay. Instead, the District Court held that "the Postal Service is entitled to impose some appropriate penalty short of discharge" on Gordon for what he said, and allowed the issue of how much withheld back pay would constitute an "appropriate penalty" to go to arbitration under the Postal Service's contract with Gordon's union. Id. at 397.[29] The Court in effect determined that it would be permissible for the Postal Service to suspend Gordon without pay for more than eighteen months,[30] but not to discharge him outright.
 
 
 67
 We think that the District Court erred in denying Gordon full back pay when discharging him was unconstitutional, as determined by the Pickering analysis. The dissenting opinion in Rankin twice stated that if it was unconstitutional to discharge McPherson for her statement about the Presidential assassination attempt, then it would have been unconstitutional to impose upon McPherson any lesser form of employment-related discipline, see --- U.S. at ----, ----, 107 S.Ct. at 2904, 2905 (Scalia, J., dissenting),[31] and the majority of the Supreme Court did not dispute this proposition. Moreover, in no other case has the Supreme Court suggested that a public employee may receive some lesser form of penalty for what she said when the first amendment prohibits the government from discharging the employee for that speech.[32]
 
 
 68
 For this reason, we do not feel comfortable in expanding the Pickering balance to include within its calculus of public employer-employee interests consideration of the nature of the penalty to be imposed. The leading cases in the area of public employee speech--Pickering, Connick, and Rankin--merely balance the value of the statements that are on matters of public concern against any harm caused by the entire publication. Indeed, the Supreme Court noted in Pickering that "the threat of dismissal from public employment is ... a potent means of inhibiting speech." 391 U.S. at 574, 88 S.Ct. at 1737. We think that the threat of a less severe penalty--certainly loss of pay over an extended period--may have an equally strong deterrent effect, especially in a case like this one in which the controversial statements are so closely linked to and embedded in the main subject of the article. We conclude that the District Court's "let-the-punishment-fit-the-crime" approach is basically inconsistent with the Supreme Court's balancing formula in Pickering-type cases. Underlying that formula is an implied acknowledgment that it is ultimately impossible for a court to know what amount of punishment for incidental misjudgments will deter statements on matters of public concern altogether, especially when the writers are unsophisticated amateurs.
 
 
 69
 In sum, Gordon's article was, as the District Court found, constitutionally protected speech. Because Gordon was impermissibly punished for that speech, we conclude that he is entitled to reinstatement with full back pay.[33]CONCLUSION
 
 
 70
 We affirm the District Court's determination that Gordon was discharged in violation of the first amendment and its order directing the Postal Service to reinstate him to his prior position. We reverse the District Court's order requiring the Postal Service to arbitrate other sanctions that might be applied against Gordon, and we hold that Gordon is entitled to full back pay.
 
 
 71
 It is so ordered.
 
 APPENDIX
 
 72
 Joe Gordon, Workers of the World Unite,
 
 The Communicator (May, 1983)
 
 73
 I don't believe that there is a group of Postal Workers that we show more disrespect for than the non-members (or scabs)--unless it's the 204-B supervisors. I have personally derided, both verbally and in print in this publication, this group of misdirected individuals. No, I'm not going daff, but perhaps my opinion is softening the area of these non-member nonconformist individuals. It is time that we try to bring them into the fold rather than to push them further away with disparaging comments. First, we must remember that these individuals are non-members by choice and personal conviction, many feel very strongly on their independence while others are merely trying to save a buck.
 
 
 74
 The most difficult of the non-members to convert to a true Unionist is the one who truly believes that the Union does not serve his best interests. The easiest to convert is the guy trying to save a buck; it should not be too difficult to show that the Unions in this Country have done more for the working man than anything since the invention of the wheel. We must take the initiative to convince the non-member in rational terms that the Union exists for their benefit--this, they probably already know, now convince them to pay for it--and that their membership not only strengthens the Union but actually allows them a voice in its' [sic] operation. When contacting a non-member on this issue keep in mind that the meeting should be kept on the level of a discussion rather than an argument. The difference being that a discussion is the exchange of knowledge while an argument is the exchange of ignorance.
 
 
 75
 Recent studies have shown that Union shops on the average make about a dollar more per hour than nonuinion [sic] shops (this is probably a concervative [sic] conclusion). Thus, in a one month period of 160 hours worked, the Union employees will make about 160 dollars more than his unorganized peer, subtracting union dues from that and the net gain is still more than 140 dollars. Now, we must add to this the gains in working conditions and job security and soon it becomes obvious that union participation is essential.
 
 
 76
 I was motivated to write this article by a recent discovery that I made at work. While working third class letters a few weeks ago I came across a bundle of letters that were being sent from Congressman Phillip Crane, a Republican from Illinois, the return address simply stated: Congressman Phillip Crane, National Right to Work Committee. Well, naturally I was curious just what the Congressman was trying to communicate under such a dubious association with the right to work committee. My curiosity did not have long to wait because one of the letters was not sealed and the contents fell out as I was sorting the mail. I could not help but seeing just what was inside. I was amazed to find that the Congressman was sending out petitions asking for help in an attempt to organize a legislative effort to support a bill that would restrict Labor Unions from organizing workers through what he called strong arm tactics. Now, I can not imagine that these petitions were going to actual members of the work force but rather to members of management, but let's assume that he was in fact addressing a member of the labor force; just what is he asking? In short he was requesting that the recipient of the petition organize in an effort to prevent them for [sic] organizing or at least to prevent others from organizing to improve the status of the worker. In other words he wanted help from unorganized labor to keep them that way; I wonder why he just didn't ask them to support the reinstitution of slavery.
 
 
 77
 It has been painfully evident that we have many enemies in Congress and we can ill afford to have them attempt to organize efforts to further reduce our ability to improve our working conditions. You have to look no further than the banner of this publication to realize the importance of the concept of Unionism, it states: Long ago we stated the reason for labor organizations. We said that union was essential to give laborers opportunity to deal on an equality with their employer--the U.S. Supreme Court. Now it is up to us to bring the non-members into the fold, it is the responsibility of each and every member to make an effort to do so. Ask your stewards who the non-members are in your office and make a tactful intelligent effort to sign them up, but don't use "strongarm" tactics, it might upset Phillip Crane.
 
 
 78
 RUTH BADER GINSBURG, Circuit Judge, concurring:
 
 
 79
 I concur in Chief Judge Wald's opinion and believe that the Dissent has not effectively presented "an objective standard upon which writers and speakers can rely." See Dissent at 322 (emphasis added). The Dissent offers as the correct and reliable test: what meaning would "a reasonable reader" draw from the speaker's or writer's words when he said or published them? See id. Is there a singular answer to that question, and if so, how does one reach it?
 
 
 80
 Joseph Gordon wrote these words in a column published in his local union's newsletter:
 
 
 81
 [O]ne of the letters was not sealed and the contents fell out as I was sorting the mail. I could not help but seeing just what was inside....
 
 
 82
 To one "reasonable reader," those words invite and encourage other postal workers engaged in sorting mail to read, disclose, and discuss the content of mail fearlessly--"with impunity." See Dissent at 315, 318, 321. Another reasonable mind regarded Gordon's words as "harmless fiction"--the "stock-in-trade" of the political speaker. See Majority Opinion at 299 (quoting from district court's opinion, which found Gordon's words not designed for literal consumption).
 
 
 83
 Under the Dissent's standard, who are the relevant "reasonable readers"? Are they the large public unlikely even to see the local union's newsletter, or are they the postal workers to whom the newsletter is circulated? The latter are firmly instructed by Postal Service regulation not to open or read mail. Would they nonetheless understand from the column that long-term employee Gordon had taken to advocating "inva[sion of] the privacy of the public mails" for personal satisfaction? See Dissent at 315.
 
 
 84
 The divergent opinions in this case demonstrate why the Dissent's standard does not appear to me altogether "objective": the same words may indeed be "reasonably understood," see Dissent at 324, by reasonable minds to mean different things. The Dissent's test, I therefore believe, offers scant security to writers and speakers against devastating consequences for plainly human, and probably harmless, error.*
 
 BORK, Circuit Judge, dissenting:
 
 85
 In this case a government employee has been punished with, it seems to me, undue severity. The severity of the punishment, however, is not before us and we have no power to alter it. What is before us is a pure question of law: whether the speech for which the employee was disciplined is protected by the first amendment. Our answer to that question, given the implications our answer will have for the future, can in no way be influenced by our dislike for the discipline imposed.
 
 
 86
 As the majority notes only in passing, maj. op. at 303 n. 10, there are first amendment interests on both sides of the balance in this case. Gordon's speech directly threatens public confidence in the privacy of the mailstream. It encourages other postal workers to invade the privacy of the public mails in order to dramatize whatever personal statements they wish to make. In the long run, the freedom to communicate that the first amendment protects will be contracted if members of the public come to believe that they may not exchange their thoughts and opinions through the mails without fear of disclosure. Although one postal worker's speech is protected today, the majority's new rules render all members of the public a little less secure in their ability to exchange ideas. As far as the first amendment is concerned, today's decision, is in my view, a truly pyrrhic victory.
 
 
 87
 The majority has created new first amendment law that runs directly contrary to Supreme Court precedent. The innovation is twofold. First, the new doctrine holds that an otherwise actionable or punishable statement is shielded by the first amendment if it is contained within a discussion of matters of public concern. Existing doctrine grants no such immunity. Second, the new doctrine holds that an otherwise actionable or punishable statement gains retroactive first amendment protection if the author later states that he did not mean what he said. Existing doctrine judges the words not by their author's self-styled "intent" but by the meaning they convey to readers at the time they are uttered. A subsequent retraction or explanation of "intent" affects only the measure of damages or appropriate punishment.
 
 
 88
 It is well to be clear at the outset, what the ramifications of the majority's doctrinal innovations are. Suppose an intelligence officer falsely stated in a column on foreign relations that he was revealing top secret information to the public. Later he retracts the statement, and claims the reference to a breach of confidence was "narrative fiction" included to "dramatize" or add shock value to the column. Since the false statement appears in the midst of a matter of public concern, and the employee's intent was to dramatize his views, the majority's new rules would mean that the government could not discipline the employee in any way. Moreover, although the most elementary common sense tells us that the statement would severely damage the confidence of our allies in our intelligence services, the majority would require that the government prove by tangible evidence what is itself an intangible harm.
 
 
 89
 Unless this decision is overruled, or unless it proves to be in "the same class as a restricted railroad ticket, good for this day and train only," Smith v. Allwright, 321 U.S. 649, 669, 64 S.Ct. 757, 768, 88 L.Ed. 987 (1944) (Roberts, J., dissenting), today's rulings are thus capable of doing severe damage in this circuit to the law of defamation and to the government's ability to discipline employee misconduct.
 
 
 90
 After setting out the relevant facts, I proceed to discuss the leading cases on disciplining government employees for speech. In my view, these precedents indicate that Gordon's speech did not relate to a matter of public concern. I then treat the relevance of libel law to employee discharge cases, and indicate why the speech in this case is of a wholly different nature from that protected in the case of Ollman v. Evans, 750 F.2d 970 (D.C.Cir.1984) (en banc). Finally, I highlight what I believe to be the majority's major errors in striking the Pickering balance, and conclude with remarks on two minor factual points.
 
 I.
 
 91
 Joseph Gordon, a postal worker, wrote a regular column for his union's newsletter. In the course of a column discussing the value of unions and urging union members to convince nonmembers to join, Gordon stated that while sorting mail he had become curious about letters whose return address was "Congressman Phillip Crane, National Right to Work Committee." Gordon's curiosity was soon satisfied, he wrote, because one of the letters was unsealed and the contents fell out. He found a petition from the congressman seeking to organize support for a bill restricting certain union organizing tactics. Gordon wrote that he read the petition, and he then proceeded to publish its contents and to comment upon them. This statement described a clear violation of postal regulations by Gordon. When the Postal Service investigated, however, Gordon claimed his published statement was false and that he had not read the mail he was sorting.[1] He later included that disavowal at the end of another column. This case proceeds upon the assumption that Gordon's first statement was false and his second statement true.
 
 
 92
 The Postal Service discharged Gordon for publishing the first statement on the ground that the publication was "conduct prejudicial to the Postal Service," which constitutes a basis for discharge. Ordinarily, this court would not interfere with an agency judgment of that sort. Informing union members and others that a postal worker, prominent as an editor of the union newsletter, thought it proper to read and publish the contents of mail certainly tends to diminish public confidence in the Postal Service and to encourage other postal workers in such conduct. The conduct described is a dereliction of duty that lies at the heart of the Service's responsibilities to the public.
 
 
 93
 A majority of this court, nonetheless, concludes that Gordon's statement of serious misconduct is protected by the first amendment. The case law does not support that conclusion.
 
 II.
 
 94
 It is to be remembered, in the first place, that Gordon was not simply an editor and a columnist. If he were a private citizen, there is no doubt that his speech would be protected by the first amendment. Gordon, however, was also a government employee with special organizational duties. The Supreme Court has repeatedly made it clear that such persons, with respect to matters involving their governmental functions, do not have all the first amendment protections that a private person enjoys. See United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 564-67, 93 S.Ct. 2880, 2889-91, 37 L.Ed.2d 796 (1973) (rejecting first amendment challenge to bar on partisan political activity by civil servants (citing Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968))); Broaderick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (same).
 
 
 95
 The government has an independent interest in preserving discipline and efficiency in public services which justifies greater regulation of employee speech. As Justice Powell stated in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974):
 
 
 96
 The Government's interest, and hence the public's interest, is the maintenance of employee efficiency and discipline.... To this end, the Government as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.
 
 
 97
 Id. at 168, 94 S.Ct. at 1651 (Powell, J., concurring). This government interest is particularly compelling when it involves safeguarding the first amendment rights of all citizens to communicate through the mails. See Lamont v. Postmaster General, 381 U.S. 301, 305, 85 S.Ct. 1493, 1495, 14 L.Ed.2d 398 (1965) ("The United States may give up the post office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues....") (quoting Milwaukee Publishing Co. v. Burleson, 255 U.S. 407, 437, 41 S.Ct. 352, 363, 65 L.Ed. 704 (1921) (Holmes, J., dissenting)).
 
 
 98
 The leading Supreme Court cases upon the government's right to discharge employees for speech are Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and Rankin v. McPherson, --- U.S. ----, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). An examination of those decisions demonstrates that the Postal Service's disciplining of Gordon was lawful.
 
 
 99
 Pickering invalidated the discharge of a teacher who published a letter in a local newspaper criticizing the school board's allocation of school funds and the alleged efforts of the board to keep teachers from informing the public about facts relevant to a vote on a school bond issue. The board held a hearing and decided that many of Pickering's statements were false and damaging, though no evidence was presented, and no findings made, as to the effect of the letter on the community or the school system. Pickering was discharged on a standard much like that applied by the Postal Service here: publication of the letter was found "detrimental to the efficient operation and administration of the schools of the district." Pickering challenged his dismissal through the Illinois courts and in the Supreme Court of the United States on the ground that the statements in his letter were protected by the first and fourteenth amendments.
 
 
 100
 Based on its examination of the individual statements in the letter, as well as its content as a whole, the Supreme Court in Pickering held that the teacher's letter was about "a matter of legitimate public concern," 391 U.S. at 571, 88 S.Ct. at 1736. The Court found that there was no evidence of actual harm from the letter, and that it was not a statement of the sort that is per se detrimental, i.e., one that would "normally" have an impact on the operation of the organization in question. Id. In contrast, there can be no doubt that a postal worker's published statement that he has read and now discloses the contents of mail he sorted would "normally" have a detrimental impact on the Postal Service: the public would lose faith in the confidentiality of mail and, if the statement and disclosure went unpunished, other postal workers would be led to believe they could safely engage in similar conduct. These are inferences of harm that courts regularly draw without actual evidence of that harm. See infra pp. 328-30.
 
 In short, Pickering, unlike our case, was
 
 101
 a case in which [a public employee] has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the [employee's] proper performance of his daily duties ... or to have interfered with the regular operation of the [government agency] generally.
 
 
 102
 391 U.S. at 572-73, 88 S.Ct. at 1737 (footnote omitted). The Court also noted that it was disinclined to equate completely dismissal from public employment for remarks critical of superiors with the award of damages in a libel suit by a public official for similar criticism. The Court indicated that a higher degree of protection would be accorded the employee in a libel suit. Id. at 574, 88 S.Ct. at 1737. It follows that if Gordon would not be protected by the libel standard, as I will show he would not, there is no question that he is liable to discipline.
 
 
 103
 In addition, and more generally, the Court stated the interests to be weighed in cases like these:
 
 
 104
 [T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer in promoting the efficiency of the public services it performs through its employees.
 
 
 105
 391 U.S. at 568, 88 S.Ct. at 1734-35.
 
 
 106
 It is apparent at once that this Pickering balance is of no assistance to Gordon and, in fact, shows that he may lawfully be discharged. Gordon's published statement that he had read, and now disclosed and discussed, the contents of mail he was sorting was not a comment on an affair of public concern. Indeed, the only public concern likely to be connected to that statement would be public consternation that a postal worker would misbehave as Gordon said he had. There is here no employee expression that can be fairly considered as "relating to any matter of political, social, or other concern to the community." On the Pickering balance, this was speech not only without value as public commentary but with an obvious potential for harm. There can be no doubt that such speech is punishable. "Statements made by public employees in their employment capacity and not touching on matters of public concern may be considered unprotected in the sense that employment-related sanctions may be imposed on the basis of such statements." Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 504 n. 22, 104 S.Ct. 1949, 1961 n. 22, 80 L.Ed.2d 502 (1984).
 
 
 107
 Connick similarly leads to the conclusion that the Postal Service may lawfully discharge Gordon. In that case, the Court upheld the discharge of an assistant district attorney, Myers, for circulating a questionnaire to her fellow staff members concerning such matters as office transfer policy (she was protesting her own transfer), office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. Though the district court had found that the issues raised in the questionnaire related to the effective functioning of the district attorney's office and so were matters of public concern, the Supreme Court said there was much force to the contention of Connick, the district attorney, that the questionnaire concerned internal office matters. The Court refused to hold that the effectiveness of the office was a matter of "public concern," as that phrase is used in the constitutional analysis appropriate to employee dismissal cases. The reason was the necessity for governmental efficiency.
 
 
 108
 The repeated emphasis in Pickering on the right of a public employee "as a citizen, in commenting upon matters of public concern," was not accidental. This language, reiterated in all of Pickering 's progeny, reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government offices could not function if every employment decision became a constitutional matter.
 
 
 109
 461 U.S. at 143, 103 S.Ct. at 1688 (footnotes omitted) (emphasis added). Thus,
 
 
 110
 Pickering, its antecedents, and its progeny lead us to conclude that if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.
 
 
 111
 Id. at 146, 103 S.Ct. at 1690 (footnote omitted) (emphasis added).
 
 
 112
 Because I sense in the majority's argument a feeling, which I share, that Gordon has been too harshly treated, it is worth quoting the immediately following passage from Connick:
 
 
 113
 Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.
 
 
 114
 Id. at 146-47, 103 S.Ct. at 1690. The Court also said that:
 
 
 115
 the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression.
 
 
 116
 ....
 
 
 117
 The Pickering balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public.
 
 
 118
 Id. at 150, 103 S.Ct. at 1692. Thus, despite the fact that one item in Myers' questionnaire related to a matter of public concern, the questionnaire and the manner of its circulation were held to be disruptive of office procedure and Myers' discharge was upheld.
 
 
 119
 In Rankin, the Court held that the first amendment barred the discharge of McPherson, a deputy constable with clerical duties, for her statement, in a private conversation with a co-worker following news of an attempt on the President's life, that "if they go for him again, I hope they get him." 107 S.Ct. at 2895. The Court first found that the statement addressed a matter of public concern, because "the statement was made in the course of a conversation addressing the [President's] policies," followed a news bulletin announcing an attempt to kill the President, and was not a statement for which McPherson could have been criminally penalized. Id. at 2897-98. The Court then held that the harm caused by McPherson's statement did not outweigh its protected status, because Constable Rankin had not based McPherson's discharge on her statement's interference with the workplace or its demonstration of McPherson's unfit character, because McPherson had made the statement in a private conversation, and because McPherson's duties did not require confidentiality or implicate policy-making or public contact. Id. at 2898-900.
 
 
 120
 The line drawn by Pickering, Connick and Rankin suggests that Gordon's speech cannot properly be characterized as addressing a matter of public concern. The teacher's statements in Pickering were addressed to local school funding, an electoral issue, and one upon which the school administration itself had taken a public position. Pickering, "as a citizen" was entitled to comment upon such an issue without fear of reprisal. The Pickering court specifically noted that it was "not presented with a situation in which a teacher has made false statements about matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts." Pickering, 391 U.S. at 572, 88 S.Ct. at 1736 (emphasis added).
 
 
 121
 A similar distinction was made in Connick. There the court found that "[t]he District Court got off on the wrong foot in this case by initially finding that, '[t]aken as a whole, the issues presented in the questionnaire relate to the effective functioning of the District Attorney's Office and are matters of public importance and concern.' " Connick, 461 U.S. at 143, 103 S.Ct. at 1688 (quoting Meyers v. Connick, 507 F.Supp. 752, 758 E.D.Pa.1981)). The Supreme Court's analysis was more refined. Meyers' questions pertaining to confidence in supervisors, the level of office morale, and the need for a grievance committee were held not to be matters of public concern. Conversely the issue of whether assistant district attorneys were pressured into working on political campaigns was held to be an issue of legitimate public interest. See Connick, 461 U.S. at 148-49, 103 S.Ct. at 1690-91.
 
 
 122
 The same principle applied in Rankin. There a deputy constable exercised her constitutional right as a citizen to criticize an elected public official. Her remarks were totally devoid of any reference to her co-workers, her superiors or office policy. In fact, her remarks were not even public, they were made in the course of a private conversation with one co-worker. See Rankin, 107 S.Ct. at 2899. See also Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 413, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979) (teacher's criticism of schools' employment policies as racially discriminatory held protected speech); Perry v. Sindermann, 408 U.S. 593, 594-95, 92 S.Ct. 2694, 2696, 33 L.Ed.2d 570 (1972) (state junior college teacher's advocacy of elevation of college to four-year status shielded from employment reprisal).
 
 
 123
 Under these precedents, the speech for which Gordon was discharged simply cannot pass the threshold "public concern" test. The notion that Gordon was exercising his rights "as a citizen" to comment on the issues of the day by falsely claiming to have read, and be disclosing, the contents of mail placed in his trust for processing is, to say the least, a novel one.
 
 
 124
 The majority purports to find support for this result in Rankin. It argues that Rankin stands for the proposition that speech must be evaluated in its broader context to determine whether or not it addresses a matter of public concern. See maj. op. at 301-302. That proposition is beyond dispute. In Rankin the context of McPherson's remark, a private discussion of the President's policies, bolstered the conclusion that hers was a political comment lacking any violent intent. See Rankin, 107 S.Ct. at 2898. One's political perception of the President is just as clearly irrelevant to fitness for public employment as a propensity to violent behavior is relevant. Context informed the Court's decision that what could be interpreted as personal threat was in fact the hyperbolic expression of a political opinion. Thus the speech for which McPherson was discharged was itself political speech on a matter of public concern. The need to conduct the Pickering balancing test was not triggered solely by the fact that her statement occurred in a political context, but rather by the fact that within such a context a reasonable listener would have considered the statement an expression of political disagreement. Thus in Rankin, like Pickering, the possibility arose that the employee was being penalized for her political views rather than for legitimate reasons connected with the efficiency of the public employer's operations.
 
 
 125
 In contrast the majority here does not suggest, and the district court did not find, that Gordon was discharged for any part of his column other than his statements about reading and disclosing the mail. The context of that statement is completely irrelevant unless it would indicate to the reasonable reader that the words actually written were not to be taken literally. No discussion I can conceive of could convert Gordon's matter-of-fact account of how he read the mail into the work of political satire the majority purports to see.
 
 
 126
 Clearly uneasy with its holding that Gordon's speech itself addressed a matter of public concern, the majority then grasps at an even weaker reed for support. It argues that, "Gordon's discussion of the contents of the Crane letter ... cannot be textually isolated from his substantive discussion of the 'right to work' issue raised by that letter." Maj. op. at 302. The majority's apparently believes that because the Crane letter itself involved a matter of public concern, Gordon's discussion thereof did so as well. I confess I am at a loss as to where the majority finds support for this new "fair use" exception to the confidentiality of the mails. Suppose the teacher in Pickering had obtained his information concerning school fiscal policies from the principal's locked desk drawer. Would Pickering's citation of stolen material addressing a matter of public concern insulate him from discharge for his breach of trust?
 
 
 127
 The majority's new rule is particularly perverse in that it operates to strip the shield of confidentiality from expressly political expression. The name of a congressman, judge, or public interest group on the outside of an envelope becomes the postal worker's invitation to "read and comment" with impunity. The majority's new rule does grave damage to the first amendment interest all citizens share in being able to communicate their political and other thoughts through the mails without fear that those thoughts will become ammunition in postal workers' private debates. Cf. NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (compelled disclosure of membership list of political organization unconstitutionally burdens associational rights).
 
 III.
 
 128
 The majority concedes that Gordon's published assertion that he violated a fundamental rule of the government service to which he belonged does not of itself merit first amendment protection. I take the majority to concede that if the statement stood alone, Gordon could be discharged for publishing it. But the majority attempts to evade the conclusion that follows from those concessions by drawing over the damaging falsehood the veil of protection that covers the remainder of Gordon's discourse on the virtues of unions. The attempt not only fails but leads the majority into both of its erroneous departures from the law.
 
 
 129
 The majority's first argument begins, and ends, with the claim, repeated in various formulations, that Gordon's statement was "in the midst of an acknowledgedly political editorial," was "inextricably bound up with" the political content of his column, and was " 'related' or 'connected' to speech on a matter of public concern." Maj. op. at 301, 302, 303 n. 8. The significance of these observations is not obvious. All statements appear in contexts of one kind or another, and any actionable statement appearing in a longer article or speech would be just as much "in the midst of" the discussion surrounding it as was Gordon's statement. The majority's suggestion that the confidentiality of the mailstream is somehow inherently "related" or "connected" to discussion of the right-to-work movement is difficult to understand. The claim that the statement was "inextricably bound up" with the political content of the column is no more than loose rhetoric. The falsehood could have been extricated very easily, and, in fact, it is the majority's position that Gordon's later retraction worked a complete, though retroactive, extrication of the falsehood from the political message.
 
 
 130
 It is, of course, true that the context in which a statement appears may alter or even reverse the literal meaning the statement would have if it stood alone. If that were the case here, Gordon's statement would be protected by the first amendment. But that is not this case. Nothing about the context in which Gordon's statement appeared suggests to the reader that he had not done exactly what he said he had done. Nor does the context detract one bit from the fact that he published the contents of mail. That being so, the placement of that statement in the midst of other material does nothing to immunize it.
 
 
 131
 The law reports are full of cases demonstrating that actionable statements are not immunized by being placed in a context of statements that are protected. It should suffice to cite New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In New York Times, the plaintiff sued for libel because of several inaccuracies, alleged to be damaging to him, in a newspaper advertisement charging a wave of terror against blacks involved in peaceful civil rights demonstrations in the South. Of ten paragraphs in the advertisement only one third and a portion of the sixth were alleged to state as facts events that never occurred. The Supreme Court noted that the advertisement as a whole, "as an expression of grievance and protest on one of the major public issues of our time, would seem clearly to qualify for the constitutional protection" claimed. 376 U.S. at 271, 84 S.Ct. at 721. The Court held that a libel action would not lie and created new first amendment limits on libel actions brought by public officials against critics of their official conduct. The Court's creation of the actual malice standard would have been wholly pointless if the false statements had been immunized simply because they were brigaded with protected statements.
 
 
 132
 In Gertz, the plaintiff was permitted to sue despite the fact that the article that defamed him was addressed to a matter of public concern, the alleged "frame-up" of a policeman as part of a communist plot to discredit local police forces, 418 U.S. at 352, 94 S.Ct. at 3013 (referring to "this public issue"), and despite the fact that the false statements were included among true ones, id. at 326, 94 S.Ct. at 3000 (listing "serious inaccuracies"). Again, the supposed rule that otherwise actionable statements are immunized when placed in the midst of protected speech failed to put in an appearance. There is no such rule and never has been. Context matters only if it signifies that the words are not meant literally.
 
 
 133
 The majority's second argument rests upon the fact that Gordon, when later confronted with the prospect of disciplinary action, claimed his statement was untrue[2] and had been made to show the irony of a union worker's having to handle what he regarded as anti-union mail. The majority's second new rule is, therefore, that a government worker may publish false statements that harm the government service by which he is employed if he later claims that irony was intended. This is so, according to the majority, even though the false statement as originally made is not presented as irony or hyperbole or fiction but as fact. I know of no case announcing or applying such a rule.
 
 
 134
 Gordon's later statement of his intention makes no difference. The question is what the ordinary reader would understand from the words he published when he published them. The majority rightly notes that a distinction must be drawn between narrative fiction and false statements of fact. See maj. op. at 306. Fiction enjoys the full protection of the first amendment, see Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501, 72 S.Ct. 777, 780, 96 L.Ed. 1098 (1952), whereas false statements of fact have little or no constitutional value. See Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). Our differences center on how a judge should arrive at the legal conclusion that he has before him one or the other type of speech. I would adhere to the well-settled view that the words should be evaluated by the meaning a reasonable reader would draw from them. This provides an objective standard upon which writers and speakers can rely. It also confines the discretion of judges, who otherwise are free to read speech with which they agree as "fictional" and speech they find offensive as "false." I think the majority's view leads to uncertainty in the law in the very area where vagueness is to be most avoided. It also allows judges to mask their like or dislike for certain expression behind an unreviewable personal determination that it constitutes fact or fiction.
 
 
 135
 My concurring colleague questions the objectivity of the "reasonable reader" standard, but offers no viable alternative. Indeed, there is none. As she puts it "the same words may indeed be 'reasonably understood' ... by reasonable minds to mean different things." Concurring Opinion at 314. Of course, this line of argument would destroy rules that have stood for centuries and leave much of our law standardless. The very development of the "reasonable person" standard in the negligence area, reflects a desire to lift the determination of liability a rung above the purely ad hoc and impressionistic. See, e.g., Restatement (Second) Torts Sec. 283 comment c (1965) ("The standard which the community demands must be an objective and external one, rather than that of individual judgment, good or bad, of the particular individual. It must be the same for all persons since the law can have no favorites.").
 
 
 136
 Just last Term in Pope v. Illinois, --- U.S. ----, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), the Supreme Court held that as to the third prong of the Miller obscenity test, "the proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political or scientific value in allegedly obscene material, but whether a reasonable person would find value in the material...." Id. 107 S.Ct. at 1921 (emphasis added). First amendment freedoms here, as in the area of obscenity, are best protected by a reasonable person standard. A writer or speaker can far more readily predict the meaning a "reasonable reader" will take from his words than the meaning a majority of unknown appellate judges will later attribute to him based on subjective standards of their own.
 
 
 137
 If, as the majority suggests, Gordon is less than adept at the use of words, see maj. op. at 306, that is a factor the Postal Service might well consider in deciding the appropriate degree of severity in the discipline it imposes. Discharge was not the required penalty. But that consideration does not affect the question whether a statement, clearly actionable or punishable when made, can be invested with first amendment protection by a later statement that irony was intended.
 
 
 138
 The Supreme Court's decisions contradict both of the majority's new rules. In Rankin, the Court squarely rejected the contention that McPherson's repetition of her statement, without its context, at the request of constable Rankin could strip the statement in context of its first amendment protection. 107 S.Ct. at 2898 n. 10. The Court explained, "[a] public employer may not divorce a statement made by an employee from its context by requiring the employee to repeat the statement, and use that statement standing alone as the basis for a discharge." Id. Rankin therefore could not defeat the protected status of McPherson's statement by calling her on the carpet with a request to repeat the statement while ignoring the statement's original meaning in context. Similarly here, Gordon cannot acquire first amendment protection for his statement, unprotected in its original context, by later explaining the statement away as ironical. Rankin thus demonstrates that the contextual meaning of speech in the first instance, not retroactive rationalizations of its meaning by employer or employee, must govern the inquiry into first amendment protection of speech.
 
 
 139
 In Connick, the Court assessed the protected status of the questions in Myers' questionnaire by reference to what the questionnaire, "if released to the public, would convey." 461 U.S. at 148, 103 S.Ct. at 1691. This is obviously a reference to what "the public," i.e., typical readers, would understand the questions in the questionnaire to say; as such, the approach in Connick clearly runs contrary to the majority's new rules in this case.
 
 
 140
 In Greenbelt Coop. Publishing Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), a newspaper reported a public debate on zoning variances at city council meetings, repeating several times in two articles that some people had characterized the negotiating position of Bresler, a builder and developer, as "blackmail." Bresler's suit alleged that the speakers at the meeting had charged him with the crime of blackmail and the newspaper, knowing that he had committed no such crime, had knowingly printed a falsehood. The Court did not, as the majority here does, hold that the publication was protected because the accusation of blackmail was "related to," or "in the midst of" a discussion of a matter of public concern, nor did the Court focus on the author's subsequent statement at trial that she had not "intended" the article to be a literal transcription of what was said at the meeting. See Greenbelt Coop. Publishing Ass'n v. Bresler, 253 Md. 324, 347, 252 A.2d 755 (1969), rev'd, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6. Instead, the Court held the publication protected because no one reading the words at the time would take them as a statement of fact.
 
 
 141
 It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable.
 
 
 142
 Id. 398 U.S. at 14, 90 S.Ct. at 1542 (footnote omitted).
 
 
 143
 In Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), a union newsletter, the Carrier's Corner, published plaintiffs' names under the heading "List of Scabs" because they had not joined the union. Above the list was a vehemently derogatory definition of the word "scab," which included the statement that a scab is "a traitor to his God, his country, his family and his class." Plaintiffs obtained libel judgments but the Supreme Court reversed. The opinion quoted the passage from Bresler set out above and continued:
 
 
 144
 It is similarly impossible to believe that any reader of the Carrier's Corner would have understood the newsletter to be charging the appellees with committing the criminal offense of treason. As in Bresler, Jack London's "definition of a scab" is merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refuse to join.
 
 
 145
 Id. at 285-86, 94 S.Ct. at 2782 (footnote omitted). The Court did not, as the majority does, hold that the statement was protected because it appeared in the context of an assertion of the virtues of belonging to a union. The Court held the statement protected because no reader would take it literally. Indeed, the rule the Supreme Court applies, and the majority does not, is hornbook defamation law: "words are to be taken in the sense in which they are reasonably understood under the circumstances, and are to be presumed to have the meaning ordinarily attached to them by those familiar with the language used." W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts Sec. 111, at 781 (5th ed. 1984) (footnote omitted).[3]
 
 
 146
 That, as the cases show, is also the first amendment test: what the reader would understand. The first amendment's application does not depend on whether the writer later says he meant something else. If the latter were the test, as the majority would make it, no libel or slander action would ever lie if the writer or speaker subsequently retracted. That is not the law. A retraction may affect the measure of damages, just as Gordon's retraction might reasonably have affected the measure of discipline. These are matters of the mitigation of the harm caused. See infra p. 330. "[T]here are partial defenses open to the defendant, which will not avoid his liability, but will go to reduce the damages recovered by the plaintiff. Perhaps the most important of these is a retraction of the defamatory statement." W. Keeton, D. Dobbs, R. Keeton & D. Owen, supra, Sec. 116A, at 845. In neither a defamation nor an employee discipline case does a retraction suddenly and retrospectively bring the full protection of the first amendment to bear upon a statement actionable or punishable when first made.
 
 
 147
 Both of the points discussed are illustrated by an analogy the majority has not succeeded in distinguishing. It is obvious that Gordon's falsehood would receive no protection if he chose to dramatize his column by saying that a named fellow worker read the mail and told him about it. This would be a routinely actionable libel of that worker, a false statement made with "actual malice" as defined by New York Times, and no one, I trust, would suppose that Gordon could escape liability because the libel was placed within the same discussion of labor issues or because he later said the statement was intended ironically and was not true.
 
 
 148
 There is no apparent reason why Gordon's false statement should fare better under the first amendment because it relates his own misconduct rather than that of another. In both cases the statement causes harm: in one case, to a fellow worker; in this case, to the Postal Service and hence to the public.[4]
 
 
 149
 The unworkability of the majority's first amendment innovations is further demonstrated by another analogy. Suppose that an airline passenger complained at length to a stewardess about the inadequacy of the airline's security arrangements and said he could prove his point because he had managed to bring a bomb on board in his carry-on luggage. When arrested, the passenger proves he has no bomb, his statement was false, and he claims he made it to dramatize his point. The bomb statement is not merely a dramatic device but it is "inextricably bound up" in the context of a discourse on a matter of public concern aimed at a relevant audience and it has been retracted. If the majority is serious about its principles, it would have to hold the statement not punishable because of the first amendment.[5] The majority now attempts to avoid the necessary implications of its newly created first amendment doctrine by saying that this example is "ridiculous" because the majority would not countenance "wildly irresponsible or damaging statements" that "clearly outweigh an employee's interest in freedom of expression." Maj. op. at 309 n. 27. It is comforting to know that the majority would not countenance such speech but the rules it has created would. If the majority insists upon a public employee speech context, the rules it has created would countenance a false statement in the union newsletter that the writer's thoughts about the values of unionism were prompted by the fact that a named supervisor coerced non-union employees to make kickbacks to keep their jobs because those employees had no union to turn to for protection. Perhaps the majority would also require a later statement that irony had been intended.
 
 IV.
 
 150
 Given my view that the first amendment's application to libel law and to employee discharge law are quite similar, it is worth saying a word about another recent case involving statements made in a published column. In Ollman v. Evans, 750 F.2d 970 (D.C.Cir.1984) (en banc), plaintiff Ollman, who had been a candidate for the chairman of the department of politics and government at the University of Maryland, and a focus of public political controversy because of his Marxist views and their relationship to his teaching, sued the columnists Evans and Novak for, among other things, publishing the remark of an unidentified political scientist that "Ollman has no status within the profession, but is a pure and simple activist."
 
 
 151
 In Ollman, I thought the statement protected by the first amendment for several reasons: (1) Ollman, by his own actions, had entered a political arena where heated discourse was to be expected and must be protected; (2) the "fact" of academic status was wholly unsuitable for trial; and (3) the statement of "no status" was not of the kind that a reader would accept as an assertion of hard fact and appeared in a context that further indicated to the reader that it was, in the Supreme Court's terminology, "rhetorical hyperbole."
 
 
 152
 None of these reasons applies to the case before us: (1) the Postal Service has not entered a political arena in which it has to accept the assertion that its employees read and publish the contents of mail; (2) the fact here does not even require a trial since it is stipulated that Gordon's statement is false; and (3) the assertion was of the kind that a reader would understand to be one of hard fact and nothing about the statement or the context in which it appeared in any way suggested that it was rhetorical hyperbole.[6]
 
 
 153
 The majority refers to my concern, expressed in Ollman, that making the statement involved in that case actionable "would burden freedom of speech or press." Maj. op. at 310. The suggestion that prohibiting Gordon from discussing the contents of the mail he sorts burdens his right to free speech in the same way libel suits threaten a free press is to stretch analogy well past the breaking point. In the libel area, we protect inaccurate speech so as to avoid chilling true speech. See New York Times, 376 U.S. at 299, 84 S.Ct. at 736. In this case, there is no need to protect Gordon's disclosure of the contents of the mail in order to avoid discouraging his speech advocating unionism. Indeed, it is undisputed that the postal service never sought to interfere with Gordon's pro-union speech until it included an assertion that he read the mails.
 
 
 154
 The majority also misunderstands my Ollman opinion when it suggests that the "totality of the circumstances" test I applied there should exonerate Gordon's statements here. The totality of the circumstances is relevant to determine whether a reasonable reader would understand a statement to be one of fact or, as the Supreme Court puts it, "rhetorical hyperbole." Gordon's statement was one of fact, and the majority points to not a single circumstance, let alone a totality, that would suggest otherwise to a reasonable reader.
 
 V.
 
 155
 If Gordon's statement of his own misconduct were entitled to some degree of protection requiring a judicial balancing of his first amendment rights against the injury to the operations of the Postal Service, I would find that the Postal Service was justified in disciplining him. Connick states that the government's "burden in justifying a particular discharge varies depending on the nature of the employee's expression," 461 U.S. at 150, 103 S.Ct. at 1692 (emphasis added). Even if one assumes that a flat, factual, and false assertion of one's own misconduct receives minimal first amendment protection, the injury necessary to outweigh that protection and justify the discharge of the person claiming his own misbehavior need not be great. The injury to public confidence and employee discipline here asserted by the Postal Service easily exceeds the required degree of injury. The injury here results from the statement's matter-of-fact quality. Whether the reader is a member of the general public who sees that his mail may routinely be read and published or a fellow postal worker who sees that he may with impunity read and publicly discuss mail, the injury to the Postal Service is obviously substantial.
 
 
 156
 Nothing in the jurisprudence of the first amendment requires the government here to prove the clear harm to the Postal Service. The reason is clear: many injuries that everyone would agree do occur are provable, if at all, only with a difficulty disproportionate to the proof's usefulness. Accordingly, the Supreme Court has often permitted government employers to assert injury to governmental operations from protected speech without presenting poof of the injury. See, e.g., Connick, 461 U.S. at 151, 103 S.Ct. at 1692 (despite "no demonstration" of injury, employer's reasonable claim of injury upheld); Pickering, 391 U.S. at 571, 88 S.Ct. at 1736 (employer permitted to raise argument that speech was "per se detrimental" to employer "absent any evidence" of its "actual effect"); see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (first amendment permits presumed damages for knowing libels). The majority avoids the common sense conclusion that Gordon's interest in dramatic flair or shock value is outweighed by its harm to public confidence in the mails only by seriously distorting the Pickering balance.
 
 
 157
 The majority begins by placing the wrong values in the scales. It does not weigh Gordon's interest in making the statement for which he was discharged against the Postal Service's legitimate concerns. Instead, it finds that the Service's interests "clearly cannot validate abridging [Gordon's] first amendment interest in writing about right-to-work legislation and its perceived threat to the labor movement." Maj. op. at 305. This runs directly counter to the Supreme Court's approach in Rankin. The Rankin Court did not weigh McPherson's undisputed right to "address[ ] the policies of the President's administration" against the public employer's interests. Rather it balanced her interest in making the discrete statement which resulted in her dismissal against the efficiency interests of the constable's office. See Rankin, 107 S.Ct. at 2898. Cf. Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 285-86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) (expressing concern that public employees not be able to insulate themselves from otherwise justified discharge by engaging in protected conduct).
 
 
 158
 A second flaw in the majority's analysis is its failure in striking the Pickering balance to consider the fact that Gordon's statement is false. The Supreme Court has told us that
 
 
 159
 [t]he use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social or political change is to be affected.
 
 
 160
 Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).
 
 
 161
 Even if Gordon's falsehood concerning a matter of internal postal operations is entitled to some first amendment protection, its falsity should be a powerful, and in my view dispositive, factor in the Pickering balance. Indeed, such is the law of this circuit as pronounced by the author of today's majority opinion. See Hanson v. Hoffman, 628 F.2d 42, 50 (D.C.Cir.1980) (Wald, J.) ("Some of the factors that appear to have entered into the 'balancing' in such cases include ... the truth or falsity of the employee's statement."); accord Ring v. Schlesinger, 502 F.2d 479, 489 (D.C.Cir.1974); see also Harper v. Blumenthal, 478 F.Supp. 176, 182 (D.D.C.1979) (Sirica, J.) ("Proportionally more weight [is] to be given to the harm caused, based on the extent to which the [employee's] statement was accurate or erroneous.").
 
 
 162
 The majority seeks to avoid the teaching of its own precedents by recasting Gordon's statements as "narrative fiction." See maj. op. at 306. But as I have already noted above, the column itself gives absolutely no indication that it is recounting anything but hard fact. In Connick, the Supreme Court found that "it require[d] no unusual insight" to conclude that Meyers' questions "no less than forcefully stated opinions and facts" carried a message likely to disrupt the district attorney's office. See Connick, 461 U.S. at 152, 103 S.Ct. at 1693. Here we deal not with questions but with declaratory sentences without any hint of ambiguity or secondary meaning. For that reason, the exculpatory characterization of Gordon's falsehood as "narrative fiction" defies comprehension.
 
 
 163
 The majority's trivialization of the Postal Service's interest in safeguarding the mails is particularly disturbing in a case involving the confidentiality of political expression. The Postal Service asserts harm to two distinct interests in this case. First, it argues that its ability to require respect for the confidentiality of the mail from its workforce has been severely undermined. The majority does not even address this concern despite Rankin' § command to consider "whether the statement impairs discipline by superiors." See Rankin, 107 S.Ct. at 2899. The majority's silence on this point is particularly discerting in light of the district court's finding that Gordon's letter "created a clear implication that postal workers could disclose the contents of mail they had seen at work if it suited their personal advantage." American Postal Workers Union v. United States Postal Service, 603 F.Supp. 393, 397 (D.D.C.1985). As the district court recognized, the only method for the Postal Service to rebut that "clear implication" was to discipline Gordon. Id.
 
 
 164
 While the majority does recognize that the Postal Service has a legitimate interest in preserving public confidence in the confidentiality of the mails, it refuses to draw the logical conclusion that Gordon's statement damaged that confidence. In so doing, the majority completely ignores well-settled precedent in this area.
 
 
 165
 In Pickering, the Supreme Court expressly contemplated the possibility that certain statements could, by their very nature, be presumed to interfere with a public employer's operations. There the Court found that "an accusation that too much money is being spent on athletics ... cannot reasonably be regarded as per se detrimental to the district's schools." Pickering, 391 U.S. at 571, 88 S.Ct. at 1736 (emphasis added). The Court was careful to note that Pickering's letter was published after the defeat of the school bond issue at the polls, and thus Pickering's erroneous statements concerning school funding could not have affected the school district's ability to raise money. Id.
 
 
 166
 In Connick, the district court placed the burden on the government to "clearly demonstrate" that the employee's speech "substantially interfered" with the employer's interests. Connick, 461 U.S. at 150, 103 S.Ct. at 1691. The Supreme Court found such a stringent requirement of proof unwarranted, stating:
 
 
 167
 [W]e do not see the necessity for a public employer to allow events to unfold to the extent that disruption of the office and the destruction of working relationships is manifest before taking action.
 
 
 168
 Connick, 461 U.S. at 152, 103 S.Ct. at 1692.
 
 
 169
 Applying this principle, the Court found that Meyers' first amendment interests did "not require that Connick tolerate action which he reasonably believed would disrupt the office." Connick, 461 U.S. at 154, 103 S.Ct. at 1694. See also Patkus v. Sangamon-Cass Consortium, 769 F.2d 1251, 1258 (7th Cir.1985) (In striking the Pickering balance, "[t]he reviewing court is to look at the ordinary or foreseeable effect of the conduct in controversy."); Kannisto v. San Francisco, 541 F.2d 841, 844 (9th Cir.1976) (police officer's statement made at roll call that he violated superior's orders "can be presumed to have had a substantial disruptive influence on the regular operation of the department") (citation omitted), cert. denied, 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977).
 
 
 170
 The majority argues that Rankin worked a fundamental change in this jurisprudence. According to the majority, the view that certain harms can be presumed to flow logically from certain speech "is even less tenable" after Rankin. Maj. op. at 303 n. 12. I think the majority misreads Rankin in several respects.
 
 
 171
 The majority apparently believes that by its use of the word "evidence" in Rankin the Supreme Court overruled Pickering and Connick sub silentio, thereby increasing the public employer's burden of proof in these cases. See maj. op. at 303 n. 12. Putting aside the extreme unlikelihood that the Supreme Court would express its rethinking of Connick (a precedent of some four years vintage) in such cryptic tones, I think the majority misconstrues the Rankin Court's statement. In the context of both the libel and public employee cases "evidence" of harm has been taken to mean proof of the damaging nature of the statement and its circulation. See Connick, 461 U.S. at 154, 103 S.Ct. at 1693; Gertz, 418 U.S. at 349-50, 94 S.Ct. at 3011-12; Dun & Bradstreet, 472 U.S. at 760-61, 105 S.Ct. at 2946, cf. C. Wright & R. Graham, Federal Practice and Procedure, Sec. 5163 (1978) ("[E]vidence is that which is offered as a basis for inference.").
 
 
 172
 In Rankin neither the damaging nature of the statement nor a degree of dissemination likely to cause harm was shown. It was in light of these circumstances that the Court found "no evidence" of damage to the employer's interests. See Rankin, 107 S.Ct. at 2899. Here, in contrast, the statement is damaging on its face and was circulated to a wide audience.
 
 
 173
 In fact, Rankin did not even deal with a claim that public confidence in the agency had been undermined. The Rankin Court emphasized that there was no "danger that McPherson had discredited the office by making her statement in public." Rankin, 107 S.Ct. at 2899. McPherson's oral remark was made in private conversation with another employee in an area to which the public was not admitted. Id. The Court also observed that McPherson "serv[es] no confidential, policymaking or public contact" role in the agency. Id. at 2900.
 
 
 174
 In contrast, Gordon's statement was mailed to the homes of 2,100 present and retired postal workers. Evidence was produced at the arbitration hearing which indicated that Gordon regularly showed copies of the Communicator to non-postal workers. See J.A. at 188. Nor was the circulation of Gordon's damaging falsehood limited to workers at the Royal Oak Post Office. The record reveals that the Communicator is mailed to local offices of the American Postal Workers' Union around the country. See J.A. at 30. In light of these facts, the majority's reliance on Rankin for the proposition that Gordon's "limited audience" muted any damage to the public's confidence in the privacy of the mailstream falls far wide of the mark. The Rankin Court was presented with no facts from which an inference of harm could arise. Nowhere did the Court indicate its intention to overrule Pickering and Connick by holding that such a presumption could never support an employee discharge. In fact, Justice Powell, a member of the majority of five in Rankin, indicated the opposite intention. He wrote:I do not read the Court's opinion as extending the Connick/Pickering test, or otherwise making it more difficult for employers to discipline workers whose speech interferes with [the employer's] goals.
 
 
 175
 Rankin, 107 S.Ct. at 2901 (Powell, J., concurring). See also Jungels v. Pierce, 825 F.2d 1127, 1132 (7th Cir.1987) (Post-Rankin decision indicating that harm to city government's ability to maintain trust of Hispanic residents flowing from civil servant's anti-Hispanic statements could be demonstrated by affidavit.). Thus, Rankin did not purport to increase the evidentiary burden a public employer must meet, rather it is today's majority opinion which works that change in the law.[7]
 
 VI.
 
 176
 I comment briefly on two of the majority's other points. The distinction between third- and first-class mail on which the majority relies, maj. op. at 305 n. 16, is irrelevant. Nothing in Gordon's column suggests to his readers that he would hesitate to read and discuss the contents of a first-class letter. More to the point, it was stipulated by the parties that Rep. Crane's letter was entitled to the same protections against unauthorized disclosure as first-class mail. J.A. at 73. The piece of mail involved in this case was not some advertising circular addressed to "occupant" with contents open to view. It was a sealed envelope addressed to a specific person. Although the harm might be greater if Gordon had said he had opened and read a first-class letter, the harm from what he actually said he had done remains.
 
 
 177
 The majority is also mistaken in believing that Gordon's retraction was adequate to dissipate the harm caused by Gordon's statement.[8] The retraction was not published until a full month later and was placed, without headline, at the end of Gordon's discussion of a completely different topic. Since a retraction's mitigation of a particular injury is always somewhat dubious given "our experience that the truth rarely catches up with a lie," Gertz v. Robert Welch, Inc., 418 U.S. at 344 n. 9, 94 S.Ct. at 3009 n. 9, even a far more effective retraction might well not have sufficed to eliminate the harm caused by Gordon's false statement. Indeed, Gordon's retraction may actually have inflicted additional damage on the Postal Service, since in the retraction Gordon published a falsehood again by saying that he never sorted third-class mail, J.A. at 73, 290. In the eyes of readers who knew Gordon and thus could recognize this statement as untrue, his retraction might well appear insincere and hence a further flouting of the Postal Service's authority. Be that as it may, the retraction here cannot be said to dissipate the harm caused by Gordon's original statement of his misconduct.
 
 
 178
 Perhaps the majority, like the district court, is impelled by a feeling that the sanction applied to Gordon was unreasonably severe. However that may be, it provides no reason to deform the settled law of the first amendment. Today's decision works such a deformation and, moreover, fails to give adequate weight to the first amendment interest in free communication through the mails.
 
 
 179
 I dissent.
 
 
 
 [1]
 The District Court reached its decision on the basis of stipulated facts and documentary exhibits presented in lieu of trial. The parties' statement of stipulated facts and accompanying exhibits appear in the Joint Appendix ("J.A.") at 61-329
 
 
 [2]
 The column is reprinted in its entirety in the Appendix to this opinion
 
 
 [3]
 Sections 115.2 and 115.5 of the Domestic Mail Manual prohibit the opening, reading, or disclosure of the contents of mail or of information contained on the face of envelopes. J.A. at 73. The Domestic Mail Manual is incorporated by reference in the Code of Federal Regulations. 39 C.F.R. Secs. 111.1-111.5 (1987)
 
 
 [4]
 A survey of circuit court cases in which courts have rejected public employees' claims that they have been disciplined in violation of the first amendment reveals that the majority involve at least one of two factors, both of which are not involved in this case. First, courts often find that the speech at issue does not substantially involve matters of public concern. See, e.g., Wilson v. City of Littleton, Colorado, 732 F.2d 765 (10th Cir.1984) (police officer could be fired for wearing shroud across his badge to mourn death of policewoman from another town because officer's personal feeling of grief was not matter of public concern); Rowland v. Mad River Local School District, 730 F.2d 444 (6th Cir.1984) (teacher's statements to other school personnel concerning her own bisexuality did not constitute speech on matter of public concern), cert. denied, 470 U.S. 1009, 105 S.Ct. 1373, 84 L.Ed.2d 392 (1985). Second, courts also frequently hold that the employee's interest in freedom of expression is outweighed by the disruption of the workplace and interference with working relationships resulting from her speech. See, e.g., Germann v. City of Kansas City, 776 F.2d 761, 764-65 (8th Cir.1985) (letter from captain in city fire department to fire chief that accused chief of being liar, of tearing department to "shreds," and of having "pitifully twisted outlook" towards department employees, created sufficient interference with working relationships to outweigh interest in freedom of expression), cert. denied, --- U.S. ----, 107 S.Ct. 63, 93 L.Ed.2d 22 (1986); Patkus v. Sangamon-Cass Consortium, 769 F.2d 1251 (7th Cir.1985) (disruption resulting from telegram sent by employee to Department of Labor complaining about action of county employer made it impossible for employee to continue to serve as liaison between county and Department of Labor)
 
 
 [5]
 No one, including the dissent, argues that Gordon wrote his editorial, or mentioned the Crane mailing, to voice a personal complaint. Nor can it fairly be said that Gordon's column, in any part, addressed "matters only of personal interest," Connick, 461 U.S. at 147, 103 S.Ct. at 169, or issues relating solely to workplace operations. But cf. Dissent at 317
 
 
 [6]
 The dissent writes that we "grasp[ ]" at a "weak[ ] reed for support" for our refusal to divorce Gordon's allusion to the Crane letter from its full context. Dissent at 12. The "reed" we grasp is Rankin, and we need do no more than recite the Supreme Court's warning that "[a] public employer may not divorce a statement made by an employee from its context ... and use that statement standing alone as the basis for discharge." --- U.S. at ---- n. 10, 107 S.Ct. at 2898, n. 10
 
 
 [7]
 In Rankin the single sentence about the prospect of a second assassination attempt could easily have been evaluated "out of [the] context" of Reagan policies, if the Supreme Court had chosen to do so, which it expressly did not. --- U.S. at ---- n. 10, 107 S.Ct. at 2897 n. 10. No such separate sentence, however, even exists in this case. Yet the dissent appears to insist not only that we force a separation, but that, once separated, a public employee's statement must meet a test of independent political content. See Dissent at 320. This entirely new, severely restrictive basis for a threshold finding of public concern would require judges to evaluate each mistake or ill-advised remark of speakers without reference to the context of the speech--a perilous detour in first amendment methods, indeed
 
 
 [8]
 We emphatically do not read Rankin as suggesting that any statement "dropped" into the middle of a discussion on a matter of public concern satisfies the Connick threshold test. The Supreme Court ruled that McPherson's statement that she hoped that a future assassin would "get him" was related to her overall commentary on the President's public policies. In that context it qualified as speech on a matter of public concern. Thus, Rankin appears to require that the speech for which a public employee has been disciplined must be "related" or "connected" to speech on a matter of public concern in order for the contextual justification to apply in the Pickering formula. We need not define the precise outer boundaries of this "relatedness" because, whatever its limits, the Rankin precedent shows conclusively that Gordon's speech falls well within those boundaries
 
 
 [9]
 The Postal Service has at no time asserted that the column detracted from Gordon's job performance or disrupted the workplace or interfered with harmonious relationships between Gordon and his supervisors and co-workers
 
 
 [10]
 The government correctly notes that protecting the confidentiality of the mailstream itself promotes first amendment concerns. The fact that there are first amendment interests "on both sides of the scales in this case," Brief for Appellant at 16, however, does not, as the dissent seems to imply, see Dissent at 1, automatically forfeit the employee's right to speak out on a matter of public concern. Rather, a Pickering balancing test would still be necessary, to weigh the actual and relative harms to both first amendment interests. For instance, Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), cited by the dissent for the public's first amendment interest in use of the mails, involved an unquestioned interruption of the mailstream by a postal regulation that interfered with a citizen's right to receive leftist political material, with no conflicting first amendment concern invoked to uphold the regulation. Also unlike Lamont, here the District Court found that any harm to the public's first amendment right to use the mails with confidence was entirely speculative and unproven. See 598 F.Supp. 564, 571-72 (1984); see also infra notes 12 & 13
 
 
 [11]
 To support its claim that Gordon's speech caused harm to its asserted interest, the Postal Service submitted an affidavit of Chief Postal Inspector Kenneth H. Fletcher. See J.A. at 45-52. The affidavit spoke in general terms of the importance of maintaining the confidentiality of the mails and emphasized that "[t]he Postal Service places the highest priority on maintaining the public's confidence in the integrity of the mails." J.A. at 48-49. As the District Court found, however, the affidavit said absolutely nothing about any concrete harm to this interest resulting from Gordon's speech; in the words of the District Court, the "affidavit shows no awareness of the particular facts of the case." 598 F.Supp. at 571. Cf. Brasslett v. Cota, 761 F.2d 827, 845 (1st Cir.1985) (detrimental impact must be objectively shown lest "public employers ... promiscuously offer a subjective justification that could almost never effectively be rebutted")
 
 
 [12]
 The government and the dissent argue that the Court can and should presume harm to its asserted interest from Gordon's article. See Brief for Appellant at 15, 27; Dissent at 327. This argument, made before the Supreme Court issued its opinion in Rankin, is even less tenable now. In Pickering, Justice Marshall required the school board to prove that Pickering's letter disrupted school operations. 391 U.S. at 570, 88 S.Ct. at 1735. The board's failure to produce evidence of harm, in turn, led to the Court's reversal of the discharge. Id. at 572-73, 88 S.Ct. at 1736-37. In Rankin, the Court made government production of some evidence of harm determinative if the government was to "demonstrate a state interest that outweighs McPherson's First Amendment rights." --- U.S. at ----, 107 S.Ct. at 2899. Indeed, the dissent in Rankin thought it "obvious[ ]" that McPherson's speech would interfere with office relations and thus outweigh McPherson's first amendment interests; in the dissent's words, "[s]tatements by the Constable's employees to the effect that 'if they go for the President again, I hope they get him' might also, to put it mildly, undermine public confidence in the Constable's office." Id. at ----, 107 S.Ct. at 2905 (Scalia, J., dissenting). Yet the majority of the Supreme Court rejected the dissent's reliance on these presumed harms. Id. at ----, ----, 107 S.Ct. at 2898, 2900; see also id. at ----, n. * 107 S.Ct. at 2900 n. * (Powell, J., concurring) ("In this case, however, there is no objective evidence that McPherson's lone comment had any negative effect on the morale or efficiency of the Constable's office.") (emphasis added). While there may be some situations where the circumstances and content of the speech make unequivocal its harmful effects, see infra note 27, neither Rankin and certainly not Gordon's slip of the pen come close to such a situation. In the District Court's words, "[w]hile there are cases where the harmful nature of speech is so apparent that no evidentiary inquiry need be made into actual disruption of the employer's 'responsibilities to the public,' there are other cases of less obvious harm where the employer must show actual, not merely presumed, disruption of its ability effectively and efficiently to fulfill its responsibilities ... [t]his is a case where the Court has concluded that a stronger showing, involving more than just a presumption of harm, is necessary." 598 F.Supp. 564, 571. Cf. Jungels v. Pierce, 825 F.2d 1127, 1132, slip op. at 7 (7th Cir.1987) (speculation "concerning public perceptions and their impact," without evidence, is insufficient to overcome first amendment claim); Brasslett v. Cota, 761 F.2d 827, 845 (1st Cir.1985) (quoting Key v. Rutherford, 645 F.2d 880, 885 (10th Cir.1981)) (" '[O]perational efficiency objections must be real and important before they can serve as a basis for discipline or discharge of a public employee.' ")
 
 
 [13]
 Our own court's precedents also indicate that, in the absence of a showing of actual harm, a presumption of harm is not sufficient to outweigh an employee's interest in speaking on a matter of public concern. See Tygrett v. Barry, 627 F.2d 1279, 1282 (D.C.Cir.1980) (" 'The initial issue ... is whether there was, in fact, an interference with the efficiency of the public services performed....' ") (quoting Jannetta v. Cole, 493 F.2d 1334, 1336 (4th Cir.1974)); Tygrett v. Washington, 543 F.2d 840, 848 (D.C.Cir.1974) ("The crucial question for decision was whether appellant's remarks ... actually impinged upon qualities making for an effective police force in such manner as to imperil its efficiency.")
 The Postal Service's reliance on Connick to support its claim that a harm may be presumed is mistaken. Although the Court stated in Connick that "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate," it also noted that the employee's speech in that case "touched upon matters of public concern in only a most limited sense" and "caution[ed] that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." 461 U.S. at 151-52, 154, 152, 103 S.Ct. at 1692, 1693, 1692-93. Obviously Gordon's statements dealt far more substantially with matters of public concern than did the "employee grievance" at issue in Connick.
 The dissent features the District Court's comment that Gordon's statement was "ill-advised" and " 'created a clear implication that postal workers could disclose the contents of mail they had seen at work if it suited their personal advantage.' " Dissent at 328 (quoting 603 F.Supp. at 397). This comment, however, is taken from a separate opinion dealing exclusively with the question of Gordon's remedy. The District Court had already determined in its opinion that "[e]ven if the Postal Service were required to show only presumed, not actual, harm to its public image, the Court would hesitate to find that such harm reasonably could be presumed on these facts," 598 F.Supp. at 572; "[t]he Postal Service has failed to meet its burden of showing any actual harm from the speech, much less harm substantial enough to outweigh the interest in free speech." Id. The opinion from which the dissent quotes does not revisit the issue of harm, and the quoted statement refers to the misjudgment Gordon made, not to its impact on the Postal Service.
 
 
 [14]
 The dissent refers to evidence indicating that "Gordon regularly showed copies of the Communicator to non-postal employees." Dissent at 329-330. The sole evidence in the record that the dissent cites, however, is the testimony of one of Gordon's best friends, George Sweeney, that he "sometimes" saw copies of the newsletter. J.A. at 188. We note, also, that the District Court found that "[t]here is no evidence that Gordon's speech was publicized outside a small segment of the Postal Service and its union, and there is no evidence that any member of the public complained or otherwise brought the matter to the Service's attention." 598 F.Supp. at 571-72
 
 
 [15]
 In Rankin, the Supreme Court treated the fact that McPherson's statement was made to a limited audience as an important factor in weighing the harm to her employer from that statement. See --- U.S. at ----, 107 S.Ct. at 2899 ("There is no suggestion that any member of the general public was present or heard McPherson's statement.")
 
 
 [16]
 The dissent's statement that "[n]othing in Gordon's column suggests to his readers that he would hesitate to read and discuss the contents of a first-class letter," see Dissent at 330, is sheer sophistry. Gordon is being punished for what he in fact wrote, not for what he failed to deny. Note too, the District Court's finding that "[i]f Gordon had discussed opening and reading a piece of first-class mail, whose privacy is sacrosanct, harm to the public perception of mail privacy might be more easily presumed. Third-class mail, which is generally meant for the widest possible public dissemination of advertising and other 'junk' mail, should not be subject to such an automatic presumption." 598 F.Supp. at 572 (footnote omitted)
 
 
 [17]
 As Chief Postal Inspector Fletcher acknowledged, third-class mail is considered "mail not sealed against inspection" and "may be opened or inspected in order to determine whether the contents may legally be mailed or whether the correct postage is paid." J.A. at 48
 
 
 [18]
 See Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) ("[T]here is no constitutional value in false statements of fact.")
 
 
 [19]
 Rankin itself acknowledges that the first amendment guarantees public employees breathing space in speaking out on political issues without fear of being fired from their jobs: " '[D]ebate on public issues should be uninhibited, robust, and wideopen, and'.... '[j]ust as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected.' " --- U.S. at ----, 107 S.Ct. at 2898 (quoting New York Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) and Bond v. Floyd, 385 U.S. 116, 136, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 (1966), respectively)
 
 
 [20]
 We confess to considerable doubt that a reasonable reader of Gordon's article would believe that his story about seeing the Crane letter was hard fact. Instead, we suspect that this reader would understand the "confession" to be a piece of dramatic invention or satirical fiction used to make his political point. Nevertheless, because judges obviously differ about how ordinary readers react, see, e.g., Ollman v. Evans, 750 F.2d 970 (D.C.Cir.1984), we are ready to assume that an ordinary reader would accept Gordon's statements regarding the Crane letter as fact. Regardless, we find his speech to be protected under the Pickering balancing test
 
 
 [21]
 The dissent's expressed skepticism about the fact that Gordon was actually shown the Crane letter by a friend, Dissent at 316 n. 1, overlooks explicit findings of the District Court: first, the dissent asserts that Gordon refused in the arbitration process to identify the friend that revealed the Crane letter; yet the District Court observed that Gordon "did produce the man at the arbitration hearing," see 603 F.Supp. at 396; second, the dissent claims that the Postal Service proved that Gordon was sorting third-class mail at "about the time when the Crane letter passed through," Dissent at 3 n. 1; yet the District Court found that although Gordon was handling this mail for two "brief stints" when the Crane letter "may have been processed ... these brief stints did not render it substantially more likely that he had seen the Crane letter on the job." 603 F.Supp. at 396
 
 
 [22]
 Although unnecessary to our holding that Gordon's speech is protected by the first amendment under the Pickering balance, we note that Gordon promptly issued a retraction of the disputed inference in the same newspaper. Gordon offered to prepare a retraction as soon as Bonds informed him that his article contained statements suggesting that he violated Postal Service regulations, and in fact Gordon wrote the retraction and delivered it to the printer the very next day. J.A. at 65, 67. The retraction was published in the next issue of the Communicator only one month after the original article appeared and presumably was circulated to the same readers. The retraction was designed specifically to dispel any concern about the confidentiality of the mails, since it made clear both that Gordon had not in fact disclosed the contents of mail that he had seen on the job and that postal workers in general were forbidden to do so. J.A. at 67. Thus, any harm that might be presumed to have resulted from Gordon's statements must equally be presumed to have been largely or wholly dissipated by his retraction
 
 
 [23]
 In Pickering, the Supreme Court explicitly stated that public employee discharge cases and defamation actions are not entirely congruent for the purposes of first amendment law: "We ... note[ ] our disinclination to make an across-the-board equation of dismissal from public employment for remarks critical of superiors with awarding damages in a libel suit by a public official for similar criticism." 391 U.S. at 574, 88 S.Ct. at 1737-38
 
 
 [24]
 Pickering demonstrates that even false statements of fact can qualify as speech on a matter of public concern. This of course does not mean that such false statements of fact will ultimately be recognized as protected speech, although, as Pickering also demonstrates, they may. 391 U.S. at 574 n. 6, 88 S.Ct. at 1738 n. 6
 
 
 [25]
 We note that for the purposes of this analysis, it does not matter whether the defamatory statement, standing alone, constitutes speech on a matter of public concern or whether the defamatory statement, in context, touches on a matter of public concern. Even a defamatory statement that itself undeniably addresses a matter of public concern can fail the second part of the Pickering analysis. For example, if an EPA employee published an article stating that a named investigator was receiving payments from chemical companies in return for falsified reports, that assertion itself would undoubtedly involve a matter of public concern, but if the assertion was false and made with full knowledge of its falsity, we have no doubt that the EPA could fire the employee for that statement without violating the first amendment
 
 
 [26]
 The dissent's statement that our opinion can be read as prohibiting the government from discharging a public employee who libels a supervisor or fellow worker, see Dissent at 325-326, is therefore wrong
 
 
 [27]
 Wildly irresponsible or damaging statements, even in the context of speech on a matter of public concern, therefore, would incur punishment. The harm to the government from such statements would clearly outweigh an employee's interest in freedom of expression. Similarly, were we considering employment in the armed forces, our first amendment calculation might necessarily differ to accommodate national security concerns. See Parker v. Levy, 417 U.S. 733, 758, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974) ("The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it."); see also Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953) (military discipline is separate from that of civil sector)
 The dissent's assertions that our approach would require constitutional protection for a statement by an airline passenger that he had brought a bomb aboard an airplane, see Dissent at 325, is ridiculous. As Justice Holmes stated in 1919, "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater, and causing a panic.... It is a question of proximity and degree." Schenk v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). The dissent's bombthreat scenario is Justice Holmes' theater-fire hypothetical. It is not this case. In any event, even if the example had any connection to the public employee speech context, so that the Pickering balancing would apply at all, it is clear that the tremendous harm from such a statement would easily outweigh any possible interest in freedom of expression.
 
 
 [28]
 The Court went on to hold in Mt. Healthy that once the employee has made this showing, the burden shifts to the government to show "that it would have reached the same decision ... even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. at 576. The parties agree that this case, unlike Mt. Healthy, is not a "dual motive" case. See Brief for Appellees at 39-40; Reply Brief for Appellant at 12, 18-19. The Postal Service does not contend that it would have fired Gordon for a permissible reason even in the absence of his protected speech; rather, it asserts that it did fire Gordon solely for the permissible reason that Gordon violated Postal Service regulations. The significance of this distinction is that in this case, the court is not asked to reach the third part of the Mt. Healthy analysis; if Gordon shows that his speech was constitutionally protected and that it was a substantial or motivating factor in the decision to fire him, he must prevail. See Reply Brief for Appellant at 12-13
 
 
 [29]
 The District Court stated that although the Pickering balancing of competing interests mandates the conclusion that the Postal Service was barred from discharging Gordon because of his article, "[t]his did not preclude some lesser form of reasonable discipline." 603 F.Supp. at 397
 
 
 [30]
 Pursuant to the District Court's order, Gordon returned to work at the Postal Service on March 30, 1985, more than twenty months after he was discharged. See Brief for Appellees at 10
 
 
 [31]
 The Rankin dissent referred specifically to the hypothetical case in which a supervisor places a formal censure in the public employee's personnel file and equated that example with a discharge decision for the purposes of first amendment law. --- U.S. at ----, 107 S.Ct. at 2901 (Scalia, J., dissenting)
 
 
 [32]
 We note also that courts have frequently held relatively minor punishments imposed on the basis of an employee's protected speech to be unconstitutional. See, e.g., Anderson v. Central Point School District No. 6, 746 F.2d 505 (9th Cir.1984) (suspension of teacher-coach from coaching position without loss of salary); Henderson v. Huecker, 744 F.2d 640 (8th Cir.1984) (placement of poor "exit recommendations" in personnel file after employee voluntarily resigned); Czurlanis v. Albanese, 721 F.2d 98 (3d Cir.1983) (suspensions without pay for ten days and thirty days)
 
 
 [33]
 Part 436.11 of the Employee and Labor Relations Manual of the Postal Service provides that "[a]n employee or former employee is entitled to receive back pay for the period during which an unjustified or unwarranted personnel action was in effect which terminated or reduced the basic compensation ... which the employee normally would have earned during the period." United States Postal Service, Employee and Labor Relations Manual Sec. 436.11 (1983). The Postal Service has not suggested either in its brief or in oral argument that an award of back pay would be barred by the doctrine of sovereign immunity. See Franchise Tax Board v. United States Postal Service, 467 U.S. 512, 519, 104 S.Ct. 2549, 2553, 81 L.Ed.2d 446 (1984) ("sue and be sued" provision of 39 U.S.C. Sec. 401(1) constitutes a broad waiver of sovereign immunity with respect to the Postal Service). There is also no question that this action was properly brought in the District Court under 39 U.S.C. Sec. 409(a), which provides, with one exception not relevant here, that "the United States District courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." See White v. Bloomberg, 501 F.2d 1379, 1384 n. 6 (4th Cir.1974) ("while employees of most federal agencies must resort to the Court of Claims to recover back pay in amounts of over $10,000, the district courts have jurisdiction over all back pay claims of Postal Service employees under 39 U.S.C. Sec. 409(a)") (citations omitted)
 
 
 *
 My dissenting colleague is a reasonable person, as is the author of the majority opinion and the district judge in this case. Striving mightily to apply the "reasonable reader" test, reasonable judges nonetheless arrive at different conclusions. I do not on that basis attribute to my dissenting colleague the sin of "subjectivity" or "standardless[ness]." See Dissent at 322. But if the judges in the majority are vulnerable to that charge, so is my dissenting colleague, in equal measure
 
 
 [1]
 This case arises under facts stipulated for purposes of summary judgment. See Joint Appendix ("J.A.") at 61-76. The Postal Service stipulated for purposes of the motion that Gordon was discharged solely for his column and not for the underlying conduct it suggested. However, it is far from a "fact" as the majority so confidently asserts, that "Gordon was given the Crane letter by a friend." See maj. op. at 31. The Postal Service produced Gordon's time rings, which indicate that he sorted third-class mail at about the time when the Crane letter passed through the Royal Oak Post Office. See J.A. at 73-74. Moreover, it was not until late in the arbitration process that Gordon finally produced the friend who had supposedly revealed to him the contents of the Crane letter. See J.A. at 210-11
 
 
 [2]
 The fact that the statement was untrue does not, of course, provide a first amendment defense. "Calculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality....' Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031. Hence the knowingly false statement ... do[es] not enjoy constitutional protection." Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)
 
 
 [3]
 The majority apparently believes that under Pickering and Connick the analysis is different in government employee discharge cases from that appropriate in defamation cases. There is no reason whatever why that should be so. Just as we do not allow writers freely to defame others by simply surrounding the defamation with political discussion, we cannot allow employees freely to damage and disrupt government agencies by surrounding their falsehoods with political remarks. Pickering and Connick, far from affording more protection to the false statements of government employees than to the libelous statements of members of the public, in fact indicate that less protection may be appropriate in a discipline case. Pickering, 391 U.S. at 569, 574, 88 S.Ct. at 1735, 1737; Connick, 461 U.S. at 147, 103 S.Ct. at 1690. In any event, an analogy between public employee speech and libelous speech is both necessary to a consistent first amendment jurisprudence and permitted by the case law. The Supreme Court routinely analyzes first amendment issues by examining cases involving the first amendment in various legal contexts. E.g., Rankin, 107 S.Ct. at 2898; Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759, 105 S.Ct. 2939, 2945, 86 L.Ed.2d 593 (1985) (plurality opinion) (reliance on Connick in analysis of libel action); Connick, 461 U.S. at 145, 103 S.Ct. at 1689
 
 
 [4]
 The Supreme Court has said again and again that public employees enjoy less constitutional protection for speech which harms their employer than do private citizens for speech which harms the reputation of another. See Pickering, 391 U.S. at 568, 88 S.Ct. at 1734; Connick, 461 U.S. at 147, 103 S.Ct. at 1690 ("[A]n employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street."). Indeed, in Pickering, after Justice Marshall had determined that the school board's interests as employer were unaffected by Pickering's speech he then applied the New York Times standard to a hypothetical libel suit with the board as plaintiff. See Pickering, 391 U.S. at 573, 88 S.Ct. at 1737
 
 
 [5]
 Indeed, the majority's rules would enable any person to escape punishment though he used words the Supreme Court has held constitutionally punishable: "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words--those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942) (footnote omitted). The Supreme Court has clearly indicated that it would not countenance such a rule. See, e.g., Kois v. Wisconsin, 408 U.S. 229, 231, 92 S.Ct. 2245, 2246, 33 L.Ed.2d 312 (1972) (per curiam) ("A quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication.")
 
 
 [6]
 In Ollman I stated that an assertion like Gordon's would not be protected: "If the statement [in a column] were that a person is known by his friends to be an alcoholic or that a professor's written works were plagiarized, then it would be a very different kind of factual assertion from that involved here, one taken more seriously by readers, and not mitigated by context." 750 F.2d at 1010 (footnote omitted). I distinguished between statements such as that "Jones stole $100 from the church poor box last Friday night" and that "[h]alf the people in this town think Jones is the kind of man who would steal from the poor box." Id. at 1008-09. The statement in question in Ollman--"no status within the profession"--was like the last assertion about what half the town thinks. Gordon's statement, however, is, like the first three, a flat assertion of fact. Like the statement that Jones did steal $100, Gordon's is a statement that a specific physical action took place. There is no quality of hyperbole about it whatever
 
 
 [7]
 The majority contends that a government employer must make "a showing of actual harm" to its interests before it may discipline an employee for injurious speech. See maj. op. at 304 n. 13. Yet when confronted with "wildly irresponsible or damaging statements," the majority would find that "[t]he harm to the government from such statements would clearly outweigh an employee's interest in freedom of expression." Maj. op. at 309 n. 27 (emphasis added). How the majority would arrive at the conclusion that "concrete harm" had been done to the public employer's interest absent "objective evidence" to that effect we are not told
 
 
 [8]
 At one point the majority explicitly disavows any reliance on Gordon's subsequent retraction. See maj. op. at 307 n. 22. Yet the majority's theory of fictional intent is based entirely on Gordon's after-the-fact assertion that his falsehood was "an attempt 'to show the irony of the labor force ... handling mail such as this.' " Maj. op. at 306 (quoting The Communicator, June 1983, J.A. at 67)